Reuben D. Nathan, Esq. (SBN 208436)
**NATHAN & ASSOCIATES, APC**
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com

Ross Cornell, Esq. (SBN 210413)
**LAW OFFICES OF ROSS CORNELL, APC**
40729 Village Dr., Suite 8 - 1989
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com

Attorneys for Plaintiff, MONICA DAWKINS

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MONICA DAWKINS, on behalf of herself and all similarly situated persons,<br><br>　　　　　Plaintiff,<br><br>v.<br><br>THE PROCTER & GAMBLE COMPANY, an Ohio corporation,<br><br>　　　　　Defendants. | Case No:  1:25-cv-01287-JLT-HBK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>　**1) CAL. PENAL CODE § 638.51**<br>　**2) CAL. PENAL CODE § 631** |

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Plaintiff MONICA DAWKINS ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant THE PROCTER & GAMBLE COMPANY, an Ohio corporation ("Defendant" or "PROCTOR & GAMBLE" or "P&G"). Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all others, by and through the investigation of undersigned counsel.

## I.    NATURE OF THE ACTION

1.    This is a class action lawsuit brought on behalf of all California residents who have accessed and used www.ivory.com (the "Website"), a website that Defendant owns and operates.

2.    Defendant surreptitiously installs and operates tracking software on the Website without providing users with adequate notice or obtaining their informed consent. The software is intentionally deployed to accomplish Defendant's commercial objectives, including identity resolution, targeted advertising, and the monetization of consumer data.

3.    To achieve these goals, Defendant enables third-party technologies that function as unlawful pen registers and/or trap and trace devices, capturing detailed non-content information about users' electronic communications such as Internet Protocol (IP) addresses, session data, clickstream activity, and form inputs in real time. Additionally, Defendant unlawfully shares the content of users' communications including the specific URLs revealing sensitive, private and embarassing pages users visit and the precise nature of the information they seek with third parties. These tools operate covertly and without judicial authorization, violating the California Invasion of Privacy Act ("CIPA"), where, as here, Plaintiff and Class Members did not consent to the interception of their communications, the use of pen register or trap and trace surveillance, or the disclosure of their communications content to third parties, nor did Defendant secure a court order permitting such surveillance.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

4.     A pixel tracker, also known as a web beacon, is a tracking mechanism embedded in a website that monitors user interactions. It typically appears as a small, transparent 1x1 image or a lightweight JavaScript snippet that activates when a webpage is loaded, or a user performs a tracked action.

5.     When triggered, the pixel transmits data from the user's browser to a third-party server. This data typically includes page views, session duration, referrer URLs, IP address, browser and device details, and other interaction metadata.

6.     When users visit the Website, Defendant causes tracking technologies to be embedded in visitors' browsers. These include, but are not limited to, the following:

- Google Trackers (Analytics, Tag Manager, DoubleClick)
- Facebook Tracker
- Tapad Tracker

7.     The third parties who operate the above-listed trackers use pieces of User Information (defined below) collected via the Website, as described herein, for their own independent purposes tied to broader advertising ecosystems, profiling, and data monetization strategies, which go beyond Defendant's direct needs, for their own financial gain. The above-listed trackers are referred to herein collectively as the "Trackers."

8.     The Trackers are operated by distinct third parties, including Google LLC (as to the Google Trackers, which include Google Analytics, Google Tag Manager, and Google Ads/DoubleClick), Meta Platforms, Inc. (as to the Facebook Tracker), and Tapad, Inc., a registered California data broker (as to the Tapad Tracker) (collectively, the "Third Parties"). Defendant aids, employs, agrees, and conspires with the Third Parties by enabling the Trackers, which transmit user data to third-party servers to identify users and support advertising, profiling, and data monetization activities.

9.     On information and belief, Defendant's Website is further equipped with additional third-party trackers that are at least pen registers and/or trap-and-trace devices or processes, including but not limited to the Criteo Tracker, The Trade Desk Tracker,

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the Quantcast Tracker, the Amazon Ads Tracker, the DoubleVerify Tracker, the Adform Tracker, the BazaarVoice Tracker and the Comscore/ScorecardResearch Tracker. Collectively, these trackers capture and transmit Plaintiff's and Class Members' addressing, routing, and signaling information to external advertising and analytics platforms without consent or court authorization, further implicating the prohibitions of CIPA.

10.    Through the Trackers, Third Parties collect a wide range of routing, addressing, and signaling information from users' browsers and devices without their knowledge or consent. This includes IP addresses; browser and device type; operating system; screen resolution; timezone; unique identifiers (such as cookies and advertising IDs); device fingerprinting attributes (such as installed fonts and plugins, color depth, graphics and audio rendering characteristics, CPU and memory capacity, and battery or network state); and behavioral telemetry (such as navigation paths, referrer URLs, session duration, scroll depth, mouse movements, clicks, taps, and video interactions). Trackers also derive approximate geolocation from users' IP addresses. Collectively, this data ("User Information") is used for behavioral profiling, location tracking, ad targeting, cross-device tracking, and participation in real-time advertising auctions. Defendant then exploits the User Information collected by the Trackers—acting jointly with the Third Parties operating them—for targeted marketing and advertising that monetize the Website. In doing so, Defendant and the Third Parties benefit from the unconsented-to collection and commercial use of Plaintiff's and Class Members' personal information.

11.    Beyond the non-content information collected through Trackers, Defendant and the Third Parties operating them also unlawfully intercept and disclose the content of users' electronic communications. Through embedded tracking technologies, Defendant captures the specific URLs and page content that users access on the Website, thereby acquiring knowledge of the precise subject matter and content of each user's information-seeking activities. When a user views a page titled "Finally,

4

a Gentler and Kinder Deodorant" or accesses articles discussing body odor management and odor protection solutions, Defendant and its Third Party partners capture this page-level data—constituting the content of users' private communications and information requests—and transmit this sensitive content to advertising networks, data brokers, and other third parties for behavioral profiling, targeted advertising, and commercial monetization. This transmission of users' communications content occurs without their knowledge or consent, and without any judicial authorization. By capturing and sharing URL-level and page-content information that reveals the sensitive nature of users' personal information-seeking activities, Defendant violates the California Invasion of Privacy Act's prohibition on the unlawful interception and disclosure of the contents of electronic communications. The Third-Party tracking code executed contemporaneously with each communication Plaintiff attempted to send to the Website. As Plaintiff's browser initiated each HTTP request, embedded scripts automatically duplicated and transmitted the same dialing, routing, addressing, and signaling information to remote third-party endpoints during the transmission itself, before the requested page finished loading.

12.    Because the Trackers capture and transmit users' IP addresses, full page URLs, referrer headers, device identifiers, and other categories of User Information, they operate as "pen registers" and/or "trap and trace devices" within the meaning of Cal. Penal Code § 638.50. These technologies silently collect routing and addressing information for commercial purposes without the user's knowledge, consent, or interaction. Courts have recognized that such conduct falls within the scope of CIPA's prohibitions. *See, e.g., Greenley v. Kochava, Inc.*, 684 F. Supp. 3d 1024, 1050 (S.D. Cal. 2023).

13.    The allegations here are made more invasive by the entities operating the Trackers and collecting Plaintiff's and Class Members' IP addresses and user information who combine the information they collect about Website users with information from other websites, adding the IP addresses and user information of

Website users to comprehensive user profiles. Those profiles are then used to track Plaintiff and Class Members across the Internet and are provided to advertisers and data partners for targeted advertising, identity resolution, cross-device tracking, and audience segmentation based on a broad universe of behavioral and demographic information.

14.    Plaintiff and the Class Members did not consent to the installation, execution, embedding, or injection of the Trackers on their devices and did not expect their behavioral data to be disclosed or monetized in this way. The Website did not display any consent banner, pop-up, cookie notice, or prior disclosure requesting authorization before installing pen-register or trap-and-trace technology. General statements in a privacy policy buried behind non-blocking hyperlinks do not constitute the express prior consent.

15.    Generalized references herein to users, visitors and consumers expressly include Plaintiff and the Class Members.

## II.    **PARTIES**

16.    Plaintiff MONICA DAWKINS is a California citizen residing in Tulare County and has an intent to remain there. Plaintiff was in California when she visited the Website, which occurred during the class period.  The allegations set forth herein are based on the Website as configured when Plaintiff visited it.

17.    Defendant THE PROCTOR & GAMBLE COMPANY is an Ohio corporation that owns, operates, and/or controls the Website which is an online platform that offers goods and services to consumers.

18.    PROCTER & GAMBLE is one of the world's largest consumer goods companies, incorporated in the State of Ohio with principal executive offices in Cincinnati, Ohio. As of 2025, P&G's portfolio of household brands including Ivory, Tide, Pampers, Gillette, Crest, and Olay that serves billions of consumers worldwide across categories such as beauty, grooming, health care, fabric and home care, and baby, feminine, and family care.

/ / /

6

19.    PROCTER & GAMBLE employs tens of thousands of people globally. Its core business revolves around the development, manufacturing, and marketing of branded consumer products. Through both physical retail and digital platforms, P&G integrates distribution, innovation, and advertising to reach consumers across more than 180 countries and territories.

20.    The Website, Ivory.com, is a cornerstone of P&G's digital ecosystem. It provides consumers with brand-specific information, including product details, usage guidance, promotions, and company values. The site allows users to learn about Ivory's product line, connect with customer support, and access broader P&G resources. It functions as both a consumer information hub and a digital extension of the Ivory brand.

21.    The Website is also integrated into P&G's broader marketing and customer engagement systems, linking to loyalty programs, advertising campaigns, and partner platforms. In addition to providing brand information, Ivory.com functions as a channel for collecting consumer data and tracking user interactions, which P&G uses for personalization and targeted advertising under its Global Consumer Privacy Policy.

### III.    JURISDICTION AND VENUE

22.    This Court has subject matter jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d)(2), because the total matter in controversy exceeds $5,000,000 and there are over 100 members of the proposed class. Further, at least one member of the proposed class is a citizen of a State within the United States and at least one defendant is the citizen or subject of a foreign state.

23.    This Court has personal jurisdiction over Defendant for the reasons set forth in paragraph 24 through 29 below:

24.    Defendant operates a nationwide e-commerce business and offers its products for sale directly to consumers in California. Defendant accepts orders placed from California, processes payments submitted with California billing information, and ships purchased goods to California addresses in the ordinary course of business. Plaintiff is a California resident who accessed the Website from California.  Defendant

therefore receives, stores, and processes California-origin electronic communications and consumer information as part of its regular commercial operations.

25. Defendant has configured the Website to deploy third-party technologies supplied by Google, Meta, Tapad, Criteo, The Trade Desk, Quantcast, Amazon Ads, DoubleVerify, Adform, Bazaarvoice, and/or Comscore/ScorecardResearch. When a user loads the Website, the Website causes that user's device to initiate electronic communications with servers operated by these companies. As part of their standard operation, these systems receive addressing, signaling, and device-level information associated with the user's connection.

26. Google maintains its corporate headquarters and extensive engineering and cloud infrastructure in California. Meta Platforms, Inc. also maintains its corporate headquarters and multiple offices across California. The Trade Desk lists its principal executive office in California and maintains additional offices in this State. Quantcast is headquartered in California. DoubleVerify and Comscore maintain offices in California in support of their commercial, engineering, or measurement operations. Amazon maintains multiple offices and infrastructure locations in California used by its advertising and cloud-delivery services. Tapad, Inc. appears in the California Data Broker Registry.

27. Plaintiff accessed the Website from within California. During Plaintiff's visits, the third-party technologies embedded in the Website received and processed Plaintiff's electronic communications. Because the companies operating those systems maintain offices, personnel, or infrastructure in California, Plaintiff's communications were received and processed by entities with an established presence in this State and through infrastructure located in this state.

28. During Plaintiff's visits to the Website from within California, Plaintiff's interactions with Defendant's online storefront including viewing product pages were transmitted through the third-party technologies Defendant embedded into the Website. The alleged interception of Plaintiff's communications occurred in the course of these

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

commercial interactions between a California consumer and Defendant's Website, and through systems operated by companies maintaining facilities, personnel, or infrastructure in California.

29.    Defendant publishes Website terms, product offerings, and consumer-facing materials that apply uniformly to users located in California. Defendant accepts California billing and shipping information, retains customer data from California purchasers, and provides customer support and fulfillment to California residents as a routine part of its business. Through its commercial practices, Website design, and integration of third-party technologies operated by companies with known California operations, Defendant maintained ongoing commercial and electronic interactions with its California business partners and California residents and caused the transmission, receipt, and processing of California users' electronic communications within and through the State of California.

30.    Venue is proper in the Eastern District of California pursuant to 28 U.S.C. § 1391(b) because (1) Plaintiff owns real property there with an intent to reside indefinitely; (2) Defendant regularly transacts business in this District and is subject to personal jurisdiction here; and (3) a substantial part of the events or omissions giving rise to the claims occurred within this District.

## IV.    GENERAL ALLEGATIONS

### 1.    *The California Invasion of Privacy Act (CIPA)*

31.    Enacted in 1967, the California Invasion of Privacy Act (CIPA) is a legislative measure designed to safeguard the privacy rights of California residents by prohibiting unauthorized wiretapping and eavesdropping on private communications. The California Legislature recognized the significant threat posed by emerging surveillance technologies, stating that "the development of new devices and techniques for the purpose of eavesdropping upon private communications … has created a serious threat to the free exercise of personal liberties and cannot be tolerated in a free and civilized society" (Cal. Penal Code § 630).

1    32.    CIPA specifically prohibits the installation or use of "pen registers" and

2    "trap and trace devices" without consent or a court order (Cal. Penal Code § 638.51(a)).

3    33.    A "pen register" is defined as "a device or process that records or decodes

4    dialing, routing, addressing, or signaling information transmitted by an instrument or

5    facility from which a wire or electronic communication is transmitted," excluding the

6    contents of the communication (Cal. Penal Code § 638.50(b)).

7    34.    Conversely, a "trap and trace device" is a device or process that captures

8    "incoming electronic or other impulses that identify the originating number or other

9    dialing, routing, addressing, or signaling information reasonably likely to identify the

10    source of a wire or electronic communication," again excluding the contents (Cal. Penal

11    Code § 638.50(b)).

12    35.    In practical terms, a pen register is a device or process that records outgoing

13    dialing information, while a trap and trace device is a device or process that records

14    incoming dialing information.

15    36.    Historically, law enforcement has utilized these devices to monitor

16    telephone calls, with pen registers recording outgoing phone numbers dialed from a

17    specific line and trap and trace devices recording the phone numbers of incoming calls

18    to that line.

19    37.    Although originally focused on landline telephone calls, CIPA's scope has

20    expanded to encompass various forms of communication, including cell phones and

21    online interactions. For instance, if a user sends an email, a pen register could record the

22    sender's email address, the recipient's email address, and the subject line, essentially

23    capturing the user's outgoing information.

24    38.    Similarly, if the user receives an email, a trap and trace device could record

25    the sender's email address, the recipient's email address and the subject line, capturing

26    the incoming information.

27    39.    Despite predating the Internet, CIPA has been interpreted by the California

28    Supreme Court to apply to new technologies where such application does not conflict

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

with the statutory scheme. *In re Google Inc.*, 2013 WL 5423918, at *21 (N.D. Cal. Sep. 26, 2013); *see also, e.g.*, *Shah v. Fandom, Inc*, 754 F. Supp. 3d 924, 930 (N.D. Cal. 2024) (finding trackers similar to those at issue here were "pen registers" and noting "California courts do not read California statutes as limiting themselves to the traditional technologies or models in place at the time the statutes were enacted"); *Mirmalek v. Los Angeles Times Communications LLC*, 2024 WL 5102709, at *3-4 (N.D. Cal. Dec. 12, 2024) (same); *Moody v. C2 Educ. Sys. Inc.* 742F. Supp. 3d 1072, 1076 (C.D. Cal. 2024) ("Plaintiff's allegations that the TikTok Software is embedded in the Website and collects information from visitors plausibly fall within the scope of §§ 638.50 and 638.51."); *Greenley,* supra, *at* 1050 (referencing CIPA's "expansive language" when finding software was a "pen register"); *Javier v. Assurance IQ, LLC,* 2022 WL 1744107, at *1 (9th Cir. May 31, 2022) ("Though written in terms of wiretapping, [CIPA] Section 631(a) applies to Internet communications. This interpretation aligns with the principle that CIPA should be construed to provide the greatest privacy protection when faced with multiple possible interpretations. *Matera v. Google Inc.*, 2016 WL 8200619, at *19 (N.D. Cal. Aug. 12, 2016).

40.    The conduct alleged herein constitutes a violation of a legally protected privacy interest that is both concrete and particularized. Invasions of privacy have long been actionable under common law. (*Patel v. Facebook*, 932 F.3d 1264, 1272 (9th Cir. 2019); *Eichenberger v. ESPN, Inc.*, 876 F.3d 979, 983 (9th Cir. 2017).)

41.    Both the legislative history and statutory language indicate that the California Legislature intended CIPA to protect core privacy rights. Courts have found that violations of CIPA give rise to concrete injuries sufficient to confer standing under Article III. (*See Campbell v. Facebook, Inc*., 2020 WL 1023350; *In re Facebook Internet Tracking Litig*., 956 F.3d 589 (9th Cir. 2020).)

42.    Individuals may pursue legal action against violators of any CIPA provision, including Section 638.51, and are entitled to seek $5,000 in statutory penalties per violation (Cal. Penal Code § 637.2(a)(1)).

1    **2.    *The Trackers Are "Pen Registers" and/or "Trap and Trace Devices"***

2    43.    When the Plaintiff and Class Members accessed the Website, their browsers

3    initiated an HTTP or HTTPS request or "GET" request to Defendant's web server, which

4    hosts the content and functionality of the site. In response, the server transmitted an

5    HTTP response containing the necessary resources, including HTML, cascading style

6    sheets (CSS), JavaScript files, and image assets, used by the browser to render and

7    display the webpage. These resources also included client-side scripts that initiate

8    communication with third-party services for analytics, marketing, and tracking purposes.

9    The server's instructions include how to properly display the Website, *e.g.* what images

10   to load, what text should appear, or what music should play.

11   44.    In addition, the server's instructions included client-side scripts that initiate

12   communication with third-party services for analytics, marketing, and tracking purposes.

13   The instructions cause the Trackers to be installed on a user's browser.  The Trackers

14   then cause the browser to send identifying information—including the user's IP address

15   and User Information to the Third Parties.  These Third Parties, through their Trackers,

16   also set a cookie on Website users' browsers, which sends a unique identifier to these

17   Third Parties that allows them to track users on the Website over multiple visits and

18   across the Internet.

19   45.    A general diagram of this process is pictured at Figure 1, which explains

20   how Defendant's Website transmits instructions back to users' browsers in response to

21   HTTP requests.

22   / / /

23

24

25   / / /

26

27

28   / / /

12

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 1:**



46.    The server's response included third-party tracking scripts that were executed by the Plaintiff's and Class Members' web browsers. These scripts, once executed, initiate client-side functions that capture routing and behavioral metadata and transmit this data, typically via HTTPS requests, to the servers of third-party tracking vendors. These actions occur without visible indicators or user awareness. The transmitted data, referred to as User Information, included identifiers such as IP addresses, device characteristics, browser types, page navigation behavior, and unique tracking cookies, all of which were used to profile users and facilitate targeted advertising.

47.    The Trackers operate by initiating HTTP or HTTPS requests using either the GET or POST method from the user's browser to external servers controlled by the Third Parties. These requests are triggered by user interactions with the Website and are used to transmit behavioral data and Device Metadata, including information such as page views, click events, session duration, and identifying browser characteristics.

48.    Plaintiff and Class Members did not provide their prior consent to Defendant to install the Trackers on their browsers or use the Trackers.  Nor did Defendant obtain a court order before installing or using the Trackers.

49.    An IP address is a numerical identifier assigned to each device or network connected to the Internet, used to facilitate communication between systems. *See hiQ Labs, Inc. v. LinkedIn Corp.*, (9th Cir. 2019) 938 F.3d 985, 991 n.4. The most common

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

format, known as IPv4, consists of four numbers separated by periods (e.g., 191.145.132.123). The traditional format of IP addresses is called IPv4, and it has a finite amount of combinations and thus is limited to approximately 4.3 billion addresses. Because this proved to be insufficient as the Internet grew, IPv6 was introduced.  IPv6 offers a vastly larger address space with 340 undecillion possible addresses.  While IPv6 adoption has been increasing, many networks still rely on IPv4.[1]

50.    Much like a telephone number, an IP address guides or routes an intentional communication signal (*i.e.*, a data packet) from one device to another.  An IP address is essential for identifying a device on the internet or within a local network, facilitating smooth communication between devices.   IP addresses can be used via external geolocation services to infer a user's general location, including state, city, approximate latitude and longitude, and in some cases, ZIP code.

51.    Public IP addresses are globally unique identifiers assigned by Internet Service Providers (ISPs) that allow devices to communicate directly over the Internet. They are globally accessible, meaning they can be reached from anywhere on the Internet, but are not inherently exposed unless data is being transmitted. Public IP addresses are essential for devices requiring direct Internet access.

52.    Public IP addresses can be used to determine the approximate physical location of a device.  For example, services like iplocation.io, use databases that map IP addresses to geographic areas, often providing information about the country, city, approximate latitude and longitude coordinates, or even the internet service provider associated with the public IP.   This geolocation capability is leveraged by online advertising and user identification services.

53.    In contrast, private IP addresses are used within internal networks and are not routable on the public Internet. The Internet Assigned Numbers Authority ("IANA")

---

[1]  *See, e.g.*, *What is the Internet Protocol*, CLOUDFLARE, https://www.cloudflare.com/learning/ network-layer/internet-protocol/; Stefano Gridelli, *What is an RFC1918 Address?*, NETBEEZ (Jan. 22, 2020), https://netbeez.net/blog/rfc1918/.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

reserves specific ranges of numbers to be exclusively used for private IP addresses (*e.g.*, 172.16.0.0 through 172.31.255.255). They are isolated from the global Internet and can be reused across different networks without conflict. For example, a home network in New York and an office network in Tokyo can both use the same private IP address (*e.g.*, 192.168.1.1) for their routers without conflict.

54. The distinction between a public and private IP address is fundamental to the architecture of modern networks. Public IP addresses facilitate global communication, while private IP addresses conserve the finite amount of combinations to make an IP address through local network communication. And crucially, a private IP address does not divulge a user's geolocation, whereas a public IP address does and is thus extensively used in advertising.

55. An analogy is useful. A public IP address is like the number for a landline telephone for a household. A private IP address is like each handset that is connected to that landline number (*e.g.*, "Handset #1," "Handset #2"). Alot can be gleaned from knowing the phone number who is making the call, while knowing Handset #1 versus Handset #2 is making a call provides additional information.

56. The same is true of IP addresses. The public IP address divulges the approximate location of the user that is connecting to the Internet and the router directing those communications (presumably the user's house or workplace), and it is the means through which the user actually communicates with the website and the Internet at large. The private IP address then distinguishes between the devices accessing the same public IP address.[2]

/ / /

---

[2] While the Trackers do not collect private IP addresses, as discussed below, the Trackers also collect Device Metadata, which distinguishes between devices accessing the same public IP address. So, by installing the Trackers on Website users' browsers, Defendant allows third parties to collect information that is analogous to a telephone number (the public IP address) and the specific handset that is making the call (the "Device Metadata").

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 2:**



*Each device on a network has a private IP address, and the router has a public IP address to communicate with the rest of the internet.*

57.    Thus, the differences between public and private IP addresses are as follows:[3]

**Figure 3:**

| Category | Private IP address | Public IP address |
|---|---|---|
| Scope | The private IP address only has a local scope in your own network. | The public IP address's scope is global. |
| Communication | It is used so devices within a network can communicate with each other. | It allows access to the internet and is used for communication outside of your own network. |
| Uniqueness | It's an address from a smaller range that's used by other devices in other local networks. | It's a unique address that's not used by other devices on the internet. |
| Provider | The router assigns a private IP address to a specific device on the local network. | The internet service provider assigns the public IP address. |
| Range | Private IP address ranges: 10.0.0.0 – 10.255.255.255, 172.16.0.0 – 172.31.255.255, 192.168.0.0 – 192.168.255.255 | Any IP address that isn't within a private IP address range. |

---

[3] WHAT'S THE DIFFERENCE BETWEEN A PUBLIC AND PRIVATE IP ADDRESS?, AVIRA (Jan. 31, 2024), https://www.avira.com/en/blog/public-vs-private-ip-address.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

58.    A public IP address is therefore "routing, addressing, or signaling information."    A public IP address functions as "routing, addressing, or signaling information" by facilitating internet communication. It provides essential information that can help determine the general geographic coordinates of a user accessing a website through geolocation databases. Additionally, a public IP address is involved in routing communications from the user's router to the intended destination, ensuring that emails, websites, streaming content, and other data reach the user correctly.

59.    As "routing, addressing, or signaling information," a public IP address is indispensable for maintaining seamless and efficient communication over the Internet. It ensures that data packets are sent from the user's router to the intended destination, such as a website or email server.

60.    A public IP address is "addressing" information because it determines the general geographic coordinates of the user who is accessing a website.

61.    A public IP address is "routing" or "signaling" information because it is sending or directing the user's communication from the router in their home or work to the website they are communicating with, and ensuring that "emails, websites, streaming content, and other data reaches you correctly."[4]

62.    Through a public IP address, a device's state, city, zip code, and approximate latitude and longitude can be determined.  Thus, knowing a user's public IP address and therefore geographical location "provide[s] a level of specificity previously unfound in marketing."[5]

63.    A public IP address allows advertisers to (i) "[t]arget [customers by] countries, cities, neighborhoods, and … postal code"[6] and (ii) "to target specific

---

[4] Anthony Freda, *Private IP vs Public IP: What's the Difference?*, AVG (June 4, 2021), https://www.avg.com/en/signal/public-vs-private-ip-address.
[5] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.
[6] *Location-Based Targeting That Puts You in Control*, CHOOZLE, https://choozle.com/geotargeting-strategies/.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

households, businesses[,] and even individuals with ads that are relevant to their interests."[7]   Indeed, "IP targeting is one of the most targeted marketing techniques [companies] can employ to spread the word about [a] product or service"[8] because "[c]ompanies can use an IP address … to personally identify individuals."[9]

64.    In fact, a public IP address is a common identifier used for "geomarketing," which is "the practice of using location data to identify and serve marketing messages to a highly-targeted audience.  Essentially, geomarketing allows [websites] to better serve [their] audience by giving [them] an inside look into where they are, where they have been, and what kinds of products or services will appeal to their needs."[10]  For example, for a job fair in specific city, companies can send advertisements to only those in the general location of the upcoming event.[11]

65.    "IP targeting is a highly effective digital advertising technique that allows you to deliver ads to specific physical addresses based on their internet protocol (IP) address. IP targeting technology works by matching physical addresses to IP addresses, allowing advertisers to serve ads to specific households or businesses based on their location."[12]

/ / /

/ / /

---

[7] Herbert Williams, *The Benefits of IP Address Targeting for Local Businesses*, LINKEDIN (Nov. 29, 2023), https://tinyurl.com/c2ne77ua.
[8] *IP Targeting: Understanding This Essential Marketing Tool*, ACCUDATA (Nov. 20, 2023), https://www.accudata.com/blog/ip-targeting/.
[9] Trey Titone, *The Future Of IP Address As An Advertising Identifier*, AD TECH EXPLAINED (May 16, 2022), https://adtechexplained.com/the-future-of-ip-address-as-an-advertising-identifier/.
[10] *See, e.g.*, *The Essential Guide to Geomarketing: Strategies, Tips & More*, DEEP SYNC (Nov. 20, 2023), https://deepsync.com/geomarketing/.
[11] *See, e.g.*, *Personalize Your Website And Digital Marketing Using IP Address*, GEOFLI, https://geofli.com/blog/how-to-use-ip-address-data-to-personalize-your-website-and-digital-marketing-campaigns.
[12] *IP Targeting*, SAVANT DSP, https://www.savantdsp.com/ip-targeting?gad_source=1&gclid=Cj 0KCQjw1Yy5BhD-ARIsAI0RbXZJKJSqMI6p1xAxyqai1WhAiXRJTbX8qYhNuEvIfSCJ4jfOV 5-5maUaAgtNEALw_wcB.

66.    "IP targeting capabilities are highly precise, with an accuracy rate of over 95%. This means that advertisers can deliver highly targeted ads to specific households or businesses, rather than relying on more general demographics or behavioral data."[13]

67.    In addition to "reach[ing] their target audience with greater precision," businesses are incentivized to use a customer's public IP address because it "can be more cost-effective than other forms of advertising."[14]  "By targeting specific households or businesses, businesses can avoid wasting money on ads that are unlikely to be seen by their target audience."[15]

68.    In addition, "IP address targeting can help businesses to improve their overall marketing strategy."[16]  "By analyzing data on which households or businesses are responding to their ads, businesses can refine their targeting strategy and improve their overall marketing efforts."[17]

69.    The collection of IP addresses here is particularly invasive here:  As a report from NATO found:

> [a] data broker may receive information about a[] [website] user, including his … IP address.  The user then opens the [website] while his phone is connected to his home Wi-Fi network.  When this happens, the data broker can use the IP address of the home network to identify the user's home, and append this to the unique profile it is compiling about the user.  If the user has a computer connected to the same network, this computer will have the same IP address. The data broker can then use the IP address to connect the computer to the same user, and identify that user when their IP address makes requests on other publisher pages within their ad network.  Now the data broker knows that

---

[13] *Id.*

[14] Herbert Williams, *The Benefits of IP Address Targeting for Local Busines*ses, LINKEDIN (Nov. 29, 2023), https://www.linkedin.com/pulse/benefits-ip-address-targeting-local-businesses-herbert-willi
ams-z7bhf.

[15] *Id.*

[16] *Id.*

[17] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

the same individual is using both the phone and the computer, which allows it to track behaviour across devices and target the user and their devices with ads on different networks.[18]

70.    In other words, not only does the collection of IP addresses by the Third Parties cause harm in and of itself, data brokers use IP addresses to identify users, append the IP address to a unique profile containing even more information about the user, attach specific IP addresses to comprehensive user profiles, and track Plaintiff and Class Members across the Internet using their IP addresses, compiling vast reams of other personal information in the process.

71.    For these reasons, under Europe's General Data Protection Regulation, IP addresses are considered "personal data, as they can potentially be used to identify an individual."[19]

72.    When companies build their websites, they install or integrate various third-party scripts into the code of the website in order to collect data from users or perform other functions.[20]

73.    Often times, third-party scripts are installed on websites "for advertising purposes."[21]

74.    Further, "[i]f the same third-party tracker is present on many sites, it can build a more complete profile of the user over time."[22]

---

[18] HENRIK TWETMAN & GUNDARS BERGMANIS-KORATS, NATO STRATEGIC COMMUNICATIONS CENTRE OF EXCELLENCE, DATA BROKERS AND SECURITY at 11 (2020), https://stratcomcoe.org/cuploads/pfiles/data_brokers_and_security_20-01-2020.pdf.
[19] IS AN IP ADDRESS PERSONAL DATA?, CONVESIO, https://convesio.com/knowledgebase/article/is-an-ip-address-personal-data/; *see also* WHAT IS PERSONAL DATA?, EUROPEAN COMMISSION, https://commission.europa.eu/law/law-topic/data-protection/reform/what-personal-data_en
[20] *See Third-party Tracking*, PIWIK, https://piwik.pro/glossary/third-party-tracking/ ("Third-party tracking refers to the practice by which a tracker, other than the website directly visited by the user, traces or assists in tracking the user's visit to the site. Third-party trackers are snippets of code that are present on multiple websites. They collect and send information about a user's browsing history to other companies…").
[21] *Id*.
[22] *Id*.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

75.    Defendant has long incorporated the Trackers' code into the code of its Website, including when Plaintiff and Class Members visited the Website.  Thus, when Plaintiff visited the Website, the Website caused the Trackers to be installed on Plaintiff's and other users' browsers.

76.    As described below, when a user visits the Website, the Website's code as programmed by Defendant installs the Trackers onto the user's browser.  This allows the Third Parties through their respective Trackers to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information, and pervasively track them across the Internet.

77.    Public IP addresses play a significant role in digital marketing by enabling geographic targeting based on a user's approximate location. Through IP geolocation services, advertisers can often determine a user's country, region, city, and in some cases, ZIP code or service area. In contexts where a static IP address is associated with a fixed residence or business, this data can contribute to household-level or business-level targeting, particularly when combined with other tracking identifiers and third-party enrichment.

78.    Defendant and the Third Parties then use the public IP addresses, Device Metadata, User Information, and other information of Website visitors that are collected and set by the Trackers, including those of Plaintiff and Class Members, to deanonymize Plaintiff and Class Members, serve hyper-targeted advertisements, and unjustly enrich themselves through this improperly collected information.  Defendant installs Trackers on users' browsers to collect User Information, including IP addresses and full URLs, which constitute outgoing routing and addressing metadata under CIPA. These identifiers serve the same function as telephony dialed numbers and therefore meet the statutory definition of a pen register or trap and trace device.

79.    At no time prior to the installation and use of the Trackers on Plaintiff's and Class Members's browsers, or prior to the use of the Trackers, did Defendant procure

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  Plaintiff's and Class Members's consent for such conduct.  Nor did Defendant obtain a

2  court order to install or use the Trackers.

3  **3.**    ***The Use of Pixel Trackers or Beacons and Digital Fingerprinting***

4        80.    Website users typically expect a degree of anonymity when browsing,

5  particularly when they are not logged into an account. However, upon visiting the

6  Website, Plaintiff's and Class Members' browsers executed third-party tracking scripts

7  embedded by the Defendant. These Trackers operate in the background of the browsing

8  session and collect detailed behavioral and technical information, which is then

9  transmitted to external third-party servers without the users' active awareness.  These

10  transmissions occurred silently, automatically, and without any visual indication to

11  Plaintiff. No disclosure, banner, or mechanism alerted Plaintiff that her device would

12  serve as a communication channel to multiple unrelated advertising and identity-

13  resolution vendors.

14        81.    The third-party transmissions were triggered the moment Plaintiff's

15  browser attempted to load each page, duplicating Plaintiff's outgoing GET and POST

16  requests and routing those signals to multiple advertising and identity-resolution

17  endpoints before the requested pages finished loading or became visible on her device.

18        82.    The Trackers also causes additional data points to be sent from Plaintiff's

19  and Class Members' browser to the Third Parties, which are meant to uniquely identify

20  users across sessions and devices.  In addition to the public IP address, key elements

21  include the user-agent string (browser, operating system, and device type) and device

22  capabilities such as supported image formats and compression methods.  Persistent

23  identifiers like the PUID, GUID, UID, PSVID, and User-Agent ensure users can be

24  tracked even after clearing standard session data like cookies.  Advanced methods like

25  fingerprinting and server-side matching remain unaffected by cookie deletion.

26  Combined, these elements form a detailed, unique fingerprint that allows for cross-site

27  tracking and behavioral profiling.

28  / / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

83.    This process, known as digital fingerprinting, involves compiling various data points such as browser version, screen resolution, installed fonts, device type, and language settings to generate a unique identifier for each user. Fingerprinting can be used to recognize repeat visits and correlate activity across different sessions or sites. When combined with form inputs, login activity, or third-party enrichment, fingerprinting can contribute to broader profiling of a user's interests, affiliations, or behaviors.

84.    When combined with additional tracking mechanisms such as cookies, login data, and third-party enrichment services, fingerprinting contributes to user profiling. This may include inferring location, browsing habits, consumer preferences, and potentially associating these patterns with known user identities. A sufficiently detailed digital fingerprint especially when correlated with other identifiers such as email addresses, form submissions, or third-party databases, can enable the reidentification of a user.

85.    The ability to associate a persistent digital profile with a specific individual using techniques such as digital fingerprinting has led to the development of a data industry known as identity resolution. Identity resolution involves recognizing users across sessions, devices, and platforms by connecting various identifiers derived from their digital behavior, including IP addresses, browser metadata, cookies, and, in some cases, login credentials. The process may occur deterministically (based on known logins or user-submitted information) or probabilistically (based on behavioral or technical similarity).

86.    In simpler terms, pen register and trap and trace mechanisms, in the digital context, refer to technologies that record metadata such as IP addresses, URLs visited, and device characteristics, information that identifies the routing and addressing of electronic communications. This can be achieved through the deployment of tracking technologies like the Trackers installed, executed, embedded, or injected in the Website, which operate without user interaction or visibility.

/ / /

23

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

87.     The Trackers provide analytics and marketing services to Defendant using the data collected from visitors to the Website when they visited the Website and from when they visited other websites that included the pen register and trap and trace devices.

88.     When users visit the Website, installed, executed, embedded or injected Trackers initiate network requests to third-party servers, using invisible image pixels, JavaScript calls, or beacon APIs. These requests include the user's IP address, which is transmitted automatically as part of the HTTP request header. In many cases, the Tracker's server responds by placing a persistent cookie in the user's browser, which serves as a unique identifier that can be used to recognize and track the user across future visits. If a user deletes their browser cookies, this identifier is removed. However, upon revisiting the Website, the process repeats: the browser executes the Tracker's script, a new identifier is set, and the Tracker resumes collecting the user's IP address and associated behavioral data.

**4.     *Plaintiff And Class Members' Data Has Financial Value***

89.     Given the number of Internet users, the "world's most valuable resource is no longer oil, but data."[23]

90.     Consumers' web browsing histories have an economic value of more than $52 per year, while their contact information is worth at least $4.20 per year, and their demographic information is worth at least $3.00 per year.[24]

91.     There is a "a study that values users' browsing histories at $52 per year, as well as research panels that pay participants for access to their browsing histories."[25]

92.     Extracted personal data can be used to design products, platforms, and marketing techniques. A study by the McKinsey global consultancy concluded that

---

[23] Ian Cohen, Are Web-Tracking Tools Putting Your Company at Risk?, Forbes (Oct 19, 2022), https://www.forbes.com/sites/forbestechcouncil/2022/10/19/are-web-tracking-tools-putting-your-company-atrisk/?sh=26481de07444

[24] *In re Facebook Internet Tracking Litig.*, 140 F. Supp. 3d 922, 928 (N.D. Cal. 2015), rev'd, 956 F.3rd 589 (9th Cir. 2020).

[25] *In re Facebook, Inc. Internet Tracking Litigation* (9th Cir. 2020) 956 F.3rd 589, 600.

24

businesses that "leverage customer behavior insights outperform peers by 85 percent in sales growth and more than 25 percent in gross margin."[26]

93.    In 2013, the Organization for Economic Cooperation and Development ("OECD") estimated that data trafficking markets had begun pricing personal data, including those obtained in illicit ways without personal consent. It found that illegal markets in personal data valued each credit cardholder record at between 1 and 30 U.S. dollars in 2009, while bank account records were valued at up to 850 U.S. dollars. Data brokers sell customer profiles of the sort that an online retailer might collect and maintain for about 55 U.S. dollars, and that individual points of personal data ranged in price from $0.50 cents for an address, $2 for a birthday, $8 for a social security number, $3 for a driver's license number, and $35 for a military record (which includes a birth date, an identification number, a career assignment, height, weight, and other information). Experiments asking individuals in the United States and elsewhere how much they value their personal data points result in estimates of up to $6 for purchasing activity, and $150-240 per credit card number or social security number.[27]

94.    The last estimate probably reflects public reporting that identify theft affecting a credit card number or social security number can result in financial losses of up to $10,200 per victim.[28]

95.    Data harvesting is one of the fastest growing industries in the country, with estimates suggesting that internet companies earned $202 per American user in 2018

---

[26] Brad Brown, Kumar Kanagasabai, Prashant Pant & Goncalo Serpa Pinto, Capturing value from your customer data, McKinsey (Mar. 15, 2017), https://www.mckinsey.com/businessfunctions/quantumblack/ourinsights/capturing-value-from-your-customer-data

[27] Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value, OECD Digital Economy Papers, No. 220 (Apr. 2, 2013), at 27-28, https://www.oecdilibrary.org/docserver/5k486qtxldmq-en.pdf

[28] Bradley J. Fikes, Identity Theft Hits Millions, Report Says, San Diego Union Tribune, Sept. 4, 2003, https://www.sandiegouniontribune.com/sdut-identity-theft-hits-millions-report-says-2003sep04-story.html.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  from mining and selling data. That figure is expected to increase with estimates for 2022
2  as high as $434 per use, reflecting a more than $200 billion industry.

3  96.    The Defendant's monetization of personal data constitutes actionable
4  economic harm under federal law, even without evidence of a direct financial loss, as a
5  "misappropriation-like injury" caused by converting user data into a revenue stream
6  through targeted advertising. *In re Facebook, Inc. Internet Tracking Litigation*, 956 F.3d
7  589 (9th Cir. 2020).

8  **5.    *Defendant Is Motivated To Monetize Consumer Information Regardless of***
9  ***Consent***

10  97.    By implementing Trackers on the Website, Defendant participates in
11  building detailed behavioral profiles of visitors. These profiles include information such
12  as which users viewed specific products, whether they initiated but abandoned the
13  checkout process, and what pages or buttons they interacted with. This data enables
14  Defendant and its advertising partners to identify repeat visits from the same device or
15  browser. This behavioral data is integrated into third-party advertising platforms,
16  allowing Defendant to deliver retargeted ads to users who previously visited the Website,
17  offer promotional incentives to users who showed purchase intent, and build "lookalike
18  audiences" that target users with similar behaviors or characteristics. These practices
19  significantly improve advertising efficiency and increase the likelihood of converting
20  user engagement into actual sales.

21  98.    Defendant has a strong financial incentive to deploy the Trackers on its
22  Website without obtaining user consent. By enabling the collection of IP addresses and
23  device-level identifiers through these technologies, Defendant facilitates integration into
24  real-time bidding ecosystems. These systems rely on bidstream data such as IP address,
25  device type, screen resolution, and referral information to assess the value of a potential
26  ad impression. This enables Defendant and its partners to participate in data-driven ad
27  targeting, increase the value of its advertising inventory, and track users across sessions

28

1  and websites, all of which provide economic benefit despite the privacy implications to

2  users.

3      99.    IP addresses are a valuable data point in digital advertising and tracking

4  systems. They can be used to approximate a user's geographic location, often down to

5  the city or ZIP code level, enabling location-based targeting. When combined with

6  cookies, browser metadata, and device identifiers, IP addresses contribute to persistent

7  user tracking across sessions and websites. They also assist advertisers and data brokers

8  in linking anonymous browsing activity to existing user profiles, which enhances ad

9  targeting precision and increases the commercial value of each tracked interaction. IP

10  addresses therefore constitute "routing, addressing, or signaling information" protected

11  under CIPA § 638.50(b).

12      100.    When users' data is collected without meaningful consent and monetized,

13  they lose control over who can access, use, or distribute their personal information. Data

14  brokers and ad tech firms aggregate and correlate identifiers such as IP addresses, device

15  IDs, and cookies with other personal data to construct detailed consumer profiles.

16  Information initially gathered in one context, such as browsing a retail website, is

17  frequently repurposed for unrelated uses and sold to third parties without the user's

18  awareness. This results in pervasive surveillance, where users are continuously tracked

19  across multiple websites, applications, and devices, often without their knowledge or

20  ability to opt out.

21  **6.    *Defendant's Conduct Constitutes An Invasion Of Plaintiff's And Class***

22  ***Members' Privacy***

23      101.    The collection of Plaintiff's and Class Members' personally identifying, de-

24  anonymized information through Defendant's installation and use of the Trackers

25  constitutes an invasion of privacy.

26      102.    As alleged herein, the Trackers are designed to conduct targeted advertising

27  and boost Defendant's revenue, all through their surreptitious collection of Plaintiff's

28  and Class Members' personal information.

103.   To put the invasiveness of Defendant's violations of the CIPA into perspective, it is also important to understand three concepts: data brokers, real-time bidding, and cookie syncing.

104.   In short, the import of these concepts is that: (i) the Third Parties are data brokers (or partner with data brokers) that collect user information from Website visitors to uniquely identify and de-anonymize users by combining their IP addresses, Device Metadata, User Information, and unique user ID values with whatever information those Third Parties have on a user from other sources; (ii) the Third Parties share that information with other entities to create the most complete user profile they can (through cookie syncing), which includes a more complete and non-anonymous portrait of the user; and (iii) those profiles are offered up for sale through the real-time bidding process to the benefit of Defendant and the Third Parties and to the detriment of users' privacy interests.

### a.  Data Brokers And Real-Time Bidding: The Information Economy

#### Data Brokers

105.   While "[t]here is no single, agreed-upon definition of data brokers in United States law,"[29] California law defines a "data broker" as "a business that knowingly collects and sells to third parties the personal information of a consumer with whom the business does not have a direct [*i.e.*, consumer-facing] relationship," subject to certain exceptions.  Cal. Civ. Code § 1798.99.80(c).

106.   Any entity that qualifies as a "data broker" under California law must specifically register as such Cal. Civ. Code § 1798.99.82(a).  Here, Defendant has implemented the Tapad Tracker on the Website, which is operated by registered California data broker Tapad, Inc.

/ / /

---

[29] Justin Sherman, Duke Sanford Cyber Policy Program, Data Brokers and Sensitive Data on U.S. Individuals: Threats to American Civil Rights, National Security, and Democracy, at 2 (Duke Sanford Cyber Policy Program, 2021), https://tinyurl.com/hy9fewhs.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

107.    "Data brokers typically offer pre-packaged databases of information to potential buyers," either through the "outright s[ale of] data on individuals" or by "licens[ing] and otherwise shar[ing] the data with third parties."[30]  Such databases are extensive, and can "not only include information publicly available [such as] from Facebook but also the user's exact residential address, date and year of birth, and political affiliation," in addition to "inferences [that] can be made from the combined data."[31]

108.    For instance, the NATO report noted that data brokers collect two sets of information: "observed and inferred (or modelled)."  The former "is data that has been collected and is actual," such as websites visited."  Inferred data "is gleaned from observed data by modelling or profiling," meaning what users may be *expected* to do.  On top of this, "[b]rokers typically collect not only what they immediately need or can use, but hoover up as much information as possible to compile comprehensive data sets that might have some future use."[32]

109.    Likewise, a report by the Duke Sanford Cyber Policy Program "examine[d] 10 major data brokers and the highly sensitive data they hold on U.S. individuals."[33]  The report found that "data brokers are openly and explicitly advertising data for sale on U.S. individuals' sensitive demographic information, on U.S. individuals' political preferences and beliefs, on U.S. individuals' whereabouts and even real-time GPS locations, on current and former U.S. military personnel, and on current U.S. government employees."[34]

/ / /

---

[30] SHERMAN, *supra*, at 2.
[31] Tehila Minkus et al., *The City Privacy Attack: Combining Social Media and Public Records for Detailed Profiles of Adults and Children*, COSN '15: PROCEEDINGS OF THE 2015 ACM ON CONFERENCE ON ONLINE SOCIAL NETWORKS 71, 71 (2015), https://dl.acm.org/doi/pdf/10.1145/2817946.2817957.
[32] TWETMAN & BERGMANIS-KORATS, *supra*, at 11.
[33] SHERMAN, *supra*, at 1.
[34] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

110.   This data collection has grave implications for Americans' right to privacy. For instance, "U.S. federal agencies from the Federal Bureau of Investigation [] to U.S. Immigration and Customs Enforcement [] purchase data from data brokers—without warrants, public disclosures, or robust oversight—to carry out everything from criminal investigations to deportations."[35]

111.   As another example:

> Data brokers also hold highly sensitive data on U.S. individuals such as race, ethnicity, gender, sexual orientation, immigration status, income level, and political preferences and beliefs (like support for the NAACP or National LGBTQ Task Force) that can be used to directly undermine individuals' civil rights. Even if data brokers do not explicitly advertise these types of data (though in many cases they do), everything from media reporting to testimony by a Federal Trade Commission commissioner has identified the risk that data brokers use their data sets to make "predictions" or "inferences" about this kind of sensitive information (race, gender, sexual orientation, etc.) on individuals.

> This data can be used by commercial entities within the U.S. to discriminately target goods and services, akin to how Facebook advertising tools allow advertisers to exclude certain groups, such as those who are identified as people with disabilities or those who are identified as Black or Latino, from seeing advertisements. Many

> industries from health insurance to life insurance to banking to e-commerce purchase data from data brokers to run advertisements and target their services.

> …

> Given identified discrimination problems in machine learning algorithms, there is great risk of these predictive tools only further driving up costs of goods and services (from insurance to housing) for minority groups.[36]

112.   Similarly, as the report from NATO noted, corporate data brokers cause numerous privacy harms, including but not limited to depriving users of the right to control who does and does not acquire their personal information, unwanted

---

[35] *Id.* at 9.
[36] *Id.*

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

advertisements that can even go as far as manipulating viewpoints, and spam and phishing attacks.[37]

**Figure 4:**



113.   As noted above, data brokers are able to compile such wide swaths of information in part by collecting users' IP addresses, Device Metadata, and User Information, which is used by data brokers to track users across the Internet.[38]

---

[37] TWETMAN & BERGMANIS-KORATS, *supra*, at 8.

[38] *Id.* at 11.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

114.   Indeed, as McAfee (a data security company) notes, "data brokers can … even place trackers or cookies on your browsers … [that] track your IP address and browsing history, which third parties can exploit."[39]

115.   These data brokers will then:

> take that data and pair it with other data they've collected about you, pool it together with other data they've got on you, and then share all of it with businesses who want to market to you. They can eventually build large datasets about you with things like: "browsed gym shorts, vegan, living in Los Angeles, income between $65k-90k, traveler, and single." Then, they sort you into groups of other people like you, so they can sell those lists of like-people and generate their income.[40]

116.   In short, by collecting IP addresses Device Metadata, and User Information, data brokers and many of the entities the Third Parties sync with can track users across the Internet, compiling various bits of information about users, building comprehensive user profiles that include an assortment of information, interests, and inferences, and offering up that information for sale to the highest bidder.  The "highest bidder" is a literal term, as explained below.

117.   As a result of Defendant's installation of trackers operated by data brokers such as Tapad and by numerous third parties with which those brokers synchronize, the information of Plaintiff and Class Members is linked to existing profiles maintained by those brokers, or used to generate new ones. This linkage occurs through the collection of IP addresses, device metadata, and other user information from the browsers of Defendant's Website visitors.

118.   These profiles are then served up to any companies that want to advertise on Defendant's Website, and Defendant's users become more valuable as a result of

---

[39]  Jasdev Dhaliwal, *How Data Brokers Sell Your Identity*, MCAFEE (June 4, 2024), https://www.mcafee.com/blogs/tips-tricks/how-data-brokers-sell-your-identity/.

[40]  Paul Jarvis, *The Problem with Data Brokers: Targeted Ads and Your Privacy*, FATHOM ANALYTICS (May 10, 2022), https://usefathom.com/blog/data-brokers.

having their IP addresses, Device Metadata, and User Information linked to these data broker profiles. Thus, Defendant is unjustly enriched through advertising revenue by installing the Trackers on Plaintiff's and Class Members' browsers, and thus, enabling the Third Parties to collect Plaintiff's and Class Members' IP addresses, Device Metadata, and User Information without consent.

*Real-Time Bidding*

119. Once data brokers and many of the entities the Third Parties sync with collect Website users' IP addresses, Device Metadata, and User Information, how do they "sell" or otherwise help Defendant monetize that information? This is where real-time bidding comes in.

120. "Real Time Bidding (RTB) is an online advertising auction that uses sensitive personal information to facilitate the process to determine which digital ad will be displayed to a user on a given website or application."[41]

121. "There are three types of platforms involved in an RTB auction: Supply Side Platforms (SSPs), Advertising Exchanges, and Demand Side Platforms (DSPs)." An SSP work[s] with website or app publishers to help them participate in the RTB process." "DSPs [which is what the Trade Desk is[42]] primarily work with advertisers to help them "[r]each relevant audiences on the open internet, drive growth, and prove your impact.."[43] And an Advertising Exchange "allows advertisers and publishers to use the same technological platform, services, and methods, and 'speak the same language' in order to exchange data, set prices, and ultimately serve an ad."[44]

122. In other words, SSPs provide user information to advertisers that might be interested in those users, DSPs like Trade Desk help advertisers select which users to

---

[41] Sara Geoghegan, *What is Real Time Bidding?*, Electronic Privacy Information Center (Jan. 15, 2025), https://epic.org/what-is-real-time-bidding/.

[42] https://www.thetradedesk.com/our-demand-side-platform ("The leading demand-side platform for data-driven advertising").

[43] *Id.*

[44] *Introducing To Ad Serving*, Microsoft Ignite (Mar. 3, 2024), https://learn.microsoft.com/en-us/xandr/industry-reference/introduction-to-ad-serving.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

advertise and target, and an Advertising Exchange is the platform on which all of this happens.

123.    The RTB process works as follows:

> After a user loads a website or app, an SSP will send user data to Advertising Exchanges … The user data, often referred to as "bidstream data," contains information like device identifiers, IP address, zip/postal code, GPS location, browsing history, location data, and more.  After receiving the bidstream data, an Advertising Exchange will broadcast the data to several DSPs [here, Trade Desk]. The DSPs will then examine the broadcasted data to determine whether to make a bid on behalf of their client.

> Ultimately, if the DSP wins the bid, its client's advertisement will appear to the user. Since most RTB auctions are held on the server/exchange side, instead of the client/browser side, the user only actually sees the winner of the auction and would not be aware of the DSPs who bid and lost.  But even the losing DSPs still benefit because they also receive and collect the user data broadcasted during the RTB auction process.  This information can be added to existing dossiers DSPs have on a user.[45]

**Figure 5:**



---

[45] Geoghegan, *supra*; *see also* REAL-TIME BIDDING, APPSFLYER, https://www.appsflyer.com/glossary/real-time-bidding/.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

124.    Facilitating this real-time bidding process means SSPs and DSPs must have as much information as possible about Defendant's users to procure the greatest interest from advertisers and the highest bids.    These entities receive assistance because Defendant also installs the trackers of data brokers on its users' browsers:

> the economic incentives of an auction mean that DSP [or SSP] with more specific knowledge of individuals will win desirable viewers due to being able to target them more specifically and out-bid other entities.  As a consequence, the bid request is not the end of the road. The DSP enlists a final actor, the data management platform (DMP) [or a data broker].  DSPs [or SSPs] send bid requests to DMPs [and data brokers], who enrich them by attempting to identify the user in the request and use a variety of data sources, such as those uploaded by the advertiser, collected from other sources, or bought from data brokers.  The DSP with the highest bid not only wins the right to deliver the ad—through the SSP—to the individual. The DSP also wins the right to cookie sync its own cookies with those from the [Advertising Exchange], thus enabling easier linkage of the data to the user's profile in the future.[46]

**Figure 6:**



---

[46] Michael Veale & Federik Zuiderveen Borgesius, *Adtech and Real-Time Bidding under European Data Protection Law*, 23 GERMAN L. J. 226, 232-33 (2022) https://tinyurl.com/yjddt5ey.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

125.   In other words, SSPs can solicit the highest bids for Website users by identifying and de-anonymizing those users by combining the information they know about that user with the information other data brokers know about that user.  If there is a match, then the SSPs will have significantly more information to provide about users, and that will solicit significantly higher bids from prospective advertisers (because the advertisers will have more information about the user to target their bids).

126.   Likewise, a DSP like the Trade Desk can generate the highest and most targeted bids from advertisers with providing those advertisers with as much information about users as possible, which it does by syncing with data brokers who, in turn, sync with other data brokers and/or are data brokers themselves.

127.   All of this naturally enriches Defendant, as its users have now become more valuable thanks to the replete information the Third Parties are able to provide about users.

128.   As the Federal Trade Commission ("FTC") has noted, "[t]he use of real-time bidding presents potential concerns," including but not limited to:

    a.   "incentiviz[ing] invasive data-sharing" by "push[ing] publishers [*i.e.*, Defendant] to share as much end-user data as possible to get higher valuation for their ad inventory—particularly their location data and cookie cache, which can be used to ascertain a person's browsing history and behavior."

    b.   "send[ing] sensitive data across geographic borders."

    c.   sending consumer data "to potentially dozens of bidders simultaneously, despite only one of those parties—the winning bidder actually using that data to serve a targeted ad.  Experts have previously cautioned that there are few (if any) technical controls ensuring those other parties do not retain that data for use in unintended ways."[47]

---

[47] FEDERAL TRADE COMMISSION, UNPACKING REAL TIME BIDDING THROUGH FTC'S CASE ON MOBILEWALLA (Dec. 3, 2024), https://www.ftc.gov/policy/advocacy-research/tech-at-ftc/2024/12/unpacking-real-time-bidding-through-ftcs-case-mobilewalla.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

129.  Given The Trade Desk operates a DSP here, the last point is particularly relevant, as it means Trade Desk collects and discloses Website users' information to *all prospective advertisers*, even if advertisers do not ultimately show a user an advertisement.  This greatly diminishes the ability of users to control their personal information.

130.  Likewise, the Electronic Privacy Information Center ("EPIC") has warned that "[c]onsumers' privacy is violated when entities disclose their information without authorization or in ways that thwart their expectations."[48]

131.  For these reasons, some have characterized "real-time bidding" as "[t]he biggest data breach ever recorded" because of the shear number of entities that receive personal information[49]:

**Figure 7:**



---

[48] Geoghegan, *supra*.
[49] Dr. Johnny Ryan, "RTB" Adtech & GDPR, https://assortedmaterials.com/rtb-evidence/ (video).

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

132.    All of this is in line with protecting the right to determine who does and does not get to know one's information, a harm long recognized at common law and one the CIPA was enacted to protect against.  *Ribas v. Clark*, 38 Cal. 3d 355 361 (1985) (noting the CIPA was drafted with a two-party consent requirement to protect "the right to control the nature and extent of the firsthand dissemination of [one's] statements"); *U.S. Dep't of Justice v. Reporters Comm. for Freedom of the Press* 489 U.S. 749, 763-64 (1989) ("[B]oth the common law and the literal understandings of privacy encompass the individual's control of information concerning his or her person.").

*Cookie Syncing*

133.    It should now be clear both the capabilities of the Third Parties (*i.e.*, data brokers like Tapad who de-anonymize users, or companies who sync with data brokers for this purpose) and the reasons Defendant installs their Trackers on its Website (to sell to advertisers in real-time bidding with as much information about users as possible to solicit the highest bids).   The final question is how do these Third Parties share information amongst each other and with others to offer the most complete user profiles up for sale?  This occurs through "cookie syncing."

134.    Cookie syncing is a process that "allow[s] web companies to share (synchronize) cookies, and match the different IDs they assign for the same user while they browse the web."[50]  This allows entities like the Third Parties to circumvent "the restriction that sites can't read each other cookies, in order to better facilitate targeting and real-time bidding."[51]

135.    Cookie syncing ("CSync") works as follows:

/ / /

---

[50] Panagiotis Papadopoulos et al., *Cookie Synchronization: Everything You Always Wanted to Know But Were Afraid to Ask*, 1 WWW '19: THE WORLD WIDE WEB CONFERENCE 1432, 1432 (2019), https://dl.acm.org/doi/10.1145/3308558.3313542.

[51] Gunes Acar et al., *The Web Never Forgets: Persistent Tracking Mechanisms in the Wild*, 6B CCS'14: ACM SIGSAC CONFERENCE ON COMPUTER AND COMMUNICATIONS SECURITY 674, 674 (2014)

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

Let us assume a user browsing several domains like website1.com and website2.com, in which there are 3rd-parties like tracker.com and advertiser.com, respectively. Consequently, these two 3rd-parties have the chance to set their own cookies on the user's browser, in order to re-identify the user in the future. Hence, tracker.com knows the user with the ID user123, and advertiser.com knows the same user with the ID userABC.

Now let us assume that the user lands on a website (say website3.com), which includes some JavaScript code from tracker.com but not from advertiser.com. Thus, advertiser.com does not (and cannot) know which users visit website3.com. However, *as soon as the code of tracker.com is called, a GET request is issued by the*

*browser to tracker.com (step 1), and it responds back with a REDIRECT request (step 2), instructing the user's browser to issue another GET request to its collaborator advertiser.com this time, using a specifically crafted URL (step 3).*

…

When advertiser.com receives the above request along with the cookie ID userABC, it finds out that userABC visited website3.com. *To make matters worse, advertiser.com also learns that the user whom tracker.com knows as user123, and the user userABC is basically one and the same user.* Effectively, CSync enabled advertiser.com to collaborate with tracker.com, in order to: (i) find out which users visit website3.com, and (ii) *synchronize (i.e., join) two different identities (cookies) of the same user on the web.*[52]

/ / /

/ / /

/ / /

---

[52] Papadopoulos, *supra*, at 1433.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 8:**



136.    Through this process, third party trackers are not only able to resolve user identities (*e.g.*, learning that who Third Party #1 knew as "userABC" and Third Party #2 knew as "user123" are the same person), they can "track a user to a much larger number of websites," even though that "do not have any collaboration with" the third party.[53]

137.    On the flip side, "CSync may re-identify web users even after they delete their cookies."[54]  "[W]hen a user erases her browser state and restarts browsing, trackers usually place and sync a new set of userIDs, and eventually reconstruct a new browsing history."[55]  But if a tracker can "respawn" its cookie or like to another persistent identifier (like an IP address), "then through CSync, all of them can link the user's browsing histories from before and after her state erasure.  Consequently: (i) users are not able to

---

[53] Papadopoulos, *supra*, at 1434.

[54] *Id*.

[55] *See id*.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

abolish their assigned userIDs even after carefully erasing their set cookies, and (ii) trackers are enabled to link user's history across state resets."[56]

138.   Thus, "syncing userIDs of a given user increases the user identifiability while browsing, thus reducing their overall anonymity on the Web."[57]

139.   Cookie syncing is precisely what is happening here.  When each of the Trackers are installed on Website users' browsers, they are calling and/or syncing their cookies with other third parties on the Website (*e.g.*, Experian, Epsilon, TransUnion, the Third Parties between one another).  The result of this process is not only that a single user is identified as one person by these multiple third parties, but they share all of the information about that user with one another (because the cookie is linked to a specific user profile).  This prevents users from actually being anonymous when they visit the Website.

140.   To summarize the proceeding allegations, data brokers focus on collecting as much information about Website users as possible to create comprehensive user profiles, and the Trackers sync with numerous other data brokers that do the same.  The Third Parties collect IP addresses, Device Metadata, User Information, and unique user IDs in the first instance, but those pieces of information are connected to information the Third Parties glean from other sources (*e.g.*, various data brokers) to build comprehensive profiles.  Through "cookie syncing," those profiles are shared amongst the Third Parties and with other entities to form the most fulsome picture with the most attributes as possible.  And those profiles are offered up for sale to interested advertisers through real-time bidding using the Third Parties' trackers, where users will command more value the more advertisers know about a user.

141.   Thus, the Third Parties enrich the value Defendant's users would otherwise command by tying the data they obtain directly from users on the Website (*e.g.*, IP

---

[56] *Id*.
[57] *Id.* at 1441.

addresses, Device Metadata, User Information, unique user IDs) with comprehensive user profiles.

142.   Accordingly, Defendant is using the Trackers in conjunction with the Third Parties to (i) de-anonymize users, (ii) offer its users up for sale in real-time bidding, and (iii) monetize its Website by installing the Trackers and allowing the Third Parties to collect as much information about Website users as possible (without consent).

143.   Thus, Defendant is unjustly enriched through their installation and use of the Trackers, which causes data to be collected by Third Parties without Plaintiff's and Class Members' consent, and that enable the Third Parties to sell Defendant's user inventory in an ad-buying system.  In addition, Plaintiff and Class Members lose the ability to control their information, as their information ends up in the hands of data brokers, advertising inventory sellers, and a virtually unlimited number advertisers themselves without knowledge or consent.

144.   When a user visits the Website, a suite of background tracking technologies is activated immediately upon page load. These include client-side scripts deployed by third-party Trackers, which begin collecting various categories of User Information without any visible indication to the user. Together, these technologies function as a coordinated data collection infrastructure that allows Defendant to analyze user behavior at a highly granular level and to leverage that insight in real time for marketing optimization, user targeting, and business intelligence.

145.   On information and belief, the Trackers operate as part of a vast and interconnected digital advertising ecosystem and these entities leverage shared identifiers, cookie syncing, and cross-device tracking techniques to follow users across websites, platforms, and environments, with tools specifically engineered to build persistent consumer profiles, enabling real-time behavioral targeting and identity resolution at scale.

146.   Defendant deploys the Trackers to build a behavioral profiling and targeted advertising system. Several of these trackers are dynamically injected into the Website

through tag management systems, initiating the collection of user behavior such as pageviews, navigation patterns, and session metadata. Others are directly embedded into the Website's code, firing automatically upon page load. Together, these technologies associate user behavior with device identifiers, cookies, and pseudonymous advertising IDs, facilitating the construction of persistent user profiles for advertising and marketing purposes.

147.    The Trackers participate in programmatic advertising ecosystems by capturing behavioral signals from the Website and linking them to advertising audiences. These trackers enable personalized ad delivery based on users' site interactions and associate browsing activity with broader ad networks through identifier syncing. Each of these platforms sets or reads cookies to maintain persistent tracking across sessions and domains, effectively participating in workflows designed to reidentify users and expand behavioral audience segments for targeted advertising.

148.    The Trade Desk performs identity enrichment and cross-device tracking functions that expand the scope of behavioral data captured through the Website. By linking browsing activity with pseudonymous identifiers and participating in identifier syncing across advertising networks, these entities create detailed, persistent user profiles that extend beyond a single browsing session or device. The Trade Desk utilizes frameworks like Unified ID 2.0 to map users across domains.   These practices convert raw behavioral data collected on the Website into monetizable, targetable audience segments within the programmatic advertising ecosystem.

*7.    Plaintiff's Personal Behavioral Information Was Shared With Third Parties*

149.    During Plaintiff's visit to the Website, Defendant caused pen-register and trap-and-trace technologies installed on the Website to record and transmit Plaintiff's own dialing, routing, addressing, and signaling information associated with Plaintiff's own specific product-page visits without her consent and without a court order. This information included the full web addresses of the exact product pages Plaintiff viewed, together with the referrer headers, timestamp signals, IP address, and persistent device

identifiers associated with her browser. The Website transmitted these precise product-level URLs to multiple third-party analytics, advertising, and identity-resolution companies in real time.

150.    Google Analytics and Google Tag Manager received the complete "document location" values identifying the exact products Plaintiff viewed, including: https://ivory.com/ivory-body-wash-coconut,   https://ivory.com/ivory-exfoliating-body-wash,            https://ivory.com/gentle-bar-soap-warm-vanilla-oat-milk,            and https://ivory.com/ivory-gentle-coconut-deodorant.    These   URLs   were   transmitted through repeated GA4 "collect" requests that included Plaintiff's device identifiers, referrer information, and other signaling data.

151.    Meta (Facebook) likewise received these same product-page URLs through its PageView pixel events, which were triggered upon Plaintiff's navigation to each page. Meta received this addressing information tied to Plaintiff's persistent "fbp" and "fbc" identifiers, IP address, and user-agent fingerprint, enabling Meta to associate Plaintiff's product-level browsing with her existing advertising and behavioral profile.

152.    BazaarVoice received the product-page URLs for Plaintiff's body-wash product   views—specifically   https://ivory.com/ivory-body-wash-coconut   and **https://ivory.com/ivory-exfoliating-body-wash**   through   beacon   transmissions containing "ref=" parameters referencing the exact URLs Plaintiff accessed. These transmissions allowed BazaarVoice to associate Plaintiff's product-specific interactions with its third-party analytics and trustmark systems.

153.    These transmissions were unique to Plaintiff's individual session, were tied to identifiers specific to her device and household, and were not hypothetical, generic, or representative of users in general. Plaintiff does not allege interception of the contents of her communications; rather, she alleges that Defendant caused the Website to record and transmit the routing, dialing, addressing, and signaling information associated with the exact product pages she viewed, the structure of which permitted the third-party

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  recipients to determine the product types Plaintiff browsed and to update behavioral and

2  identity-graph files associated with her device.

3    154.  Plaintiff did not provide express consent, prior or otherwise, to the

4  installation or use of any pen-register or trap-and-trace device on her browser. At no

5  point before or during her visit was Plaintiff presented with any disclosure, prompt,

6  interface, or mechanism requesting authorization to deploy technologies that record or

7  transmit her dialing, routing, addressing, or signaling information, nor did any Website

8  page describe or seek permission for the use of such devices or for the transmission of

9  the precise product-level URLs she viewed to third parties. General statements buried

10  within a Privacy Policy cannot constitute the express, prior consent required by Cal.

11  Penal Code § 638.51; nor can continued use of a website be treated as authorization for

12  pen-register or trap-and-trace surveillance. Plaintiff's ordinary browsing cannot

13  reasonably be understood as agreeing to the installation or use of such devices on her

14  communications.

15    155.  During Plaintiff's session on the Website, outbound requests contained

16  Plaintiff's personal IP address, her browser's unique device fingerprint headers, the

17  precise URLs of the Website's product pages she viewed, and persistent identifiers

18  assigned by Google, Meta, BazaarVoice, and Tapad. These records confirm that the

19  challenged transmissions were specific to Plaintiff, occurred during her session, and

20  were not inferred or hypothetical.

21    156.  Plaintiff held a reasonable expectation that communications between her

22  browser and the Website—such as which product pages she chose to view—would not

23  be secretly transmitted to third-party advertising networks. The secrecy of these

24  communications is a protected privacy interest at common law and with the privacy

25  interests recognized at law.  Defendant's undisclosed redirection of Plaintiff's routing

26  and addressing metadata to commercial entities invaded this protected sphere.

27    157.  The injuries alleged here—secret interception, undisclosed sharing with

28  unrelated third parties, household identification, and commercial exploitation of one's

browsing activity—bear a close relationship to harms traditionally recognized at common law, including intrusion upon seclusion, breach of confidence, and eavesdropping. These long-recognized torts confirm the concreteness of Plaintiff's injury.

## 8.    *Plaintiff's Body Odor Concerns Were Disclosed To Third Parties*

158.   During her visit to the Website, Plaintiff accessed multiple pages related to body odor management and deodorant products. Specifically, Plaintiff navigated to and read two articles discussing body odor concerns and product solutions:

a. "Finally, a Gentler and Kinder Deodorant" (https://ivory.com/a-gentler-kinder-deodorant), which discusses fighting body odor, 24-hour odor protection, skin irritation from deodorants, and formulations designed to address odor while being gentle on sensitive underarm skin.

b. "This Deodorant is Kinder and Gentler on Your Skin" (https://ivory.com/this-deodorant-is-kinder-and-gentler-on-your-skin), which similarly addresses body odor protection, sensitive underarm skin care, and odor control solutions.

159.   The titles and content of these articles explicitly reveal that Plaintiff was seeking information about body odor management, underarm odor protection, and solutions for body odor concerns, highly personal matters that carry significant social stigma and psychological implications, as detailed below.

160.   Each time Plaintiff accessed these body odor-related pages, Defendant's Website caused her browser to transmit the complete URLs including the article titles explicitly referencing "deodorant," "odor," and "gentler on your skin" to multiple third-party tracking companies. The full URLs transmitted included:

- https://ivory.com/a-gentler-kinder-deodorant
- https://ivory.com/this-deodorant-is-kinder-and-gentler-on-your-skin
- https://ivory.com/deodorant
- https://ivory.com/gentle-deodorant-hint-of-waterlily-scent

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

161.    These exact body odor-related page URLs were transmitted via HTTP Referer headers and tracking parameters to the following third parties:

- Google Analytics – received complete URLs revealing Plaintiff's body odor article views
- Google Tag Manager – received complete URLs revealing Plaintiff's body odor article views
- Meta/Facebook – received complete URLs revealing Plaintiff's body odor article views through Facebook Pixel PageView events
- Tapad – received complete URLs revealing Plaintiff's body odor article views through identifier synchronization requests
- PriceSpider – received complete URLs revealing Plaintiff's body odor article views
- Bazaarvoice – received complete URLs revealing Plaintiff's body odor article views through review and ratings platform integrations

162.    Each of these third parties received not only Plaintiff's IP address and device identifiers, but also the human-readable, semantic content embedded in the URLs themselves—specifically, that Plaintiff was reading articles about body odor, deodorant efficacy, underarm odor protection, and sensitive skin issues related to odor management.

163.    The transmission of these body odor-related URLs constitutes the disclosure of sensitive personal information about Plaintiff's hygiene concerns, body image anxieties, and perceived need for odor control products—information that Plaintiff reasonably expected would remain private between herself and the Website.

164.    Plaintiff did not consent to Defendant sharing information about her body odor concerns with Google, Meta/Facebook, Tapad, PriceSpider, Bazaarvoice, or any other third party. Plaintiff had no knowledge that reading articles about body odor on Defendant's Website would result in multiple advertising, analytics, and data broker companies learning about her personal hygiene concerns.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

165.    The human-readable nature of these transmissions is significant. As detailed in the tracker-specific allegations above and confirmed by Figure 11 and Figure 15 below, Defendant did not transmit anonymized codes or encrypted references to Plaintiff's browsing activity. Instead, Defendant caused Plaintiff's browser to transmit the literal text to Google and Meta, immediately revealing to those third parties that Plaintiff was seeking information about body odor management and deodorant products. These human-readable URLs, combined with Plaintiff's IP address and persistent device identifiers, enabled Google and Meta to add body odor concerns to Plaintiff's behavioral profile without any obfuscation or anonymization.

166.    The disclosure of Plaintiff's body odor concerns to these third parties occurred automatically, instantaneously, and without any notice, consent mechanism, or opportunity for Plaintiff to prevent the disclosure. Before Plaintiff could even finish reading the articles about body odor management, her interest in those topics had already been transmitted to and recorded by multiple commercial surveillance companies.

## 9.    *The Highly Sensitive and Personal Nature of Body Odor Concerns*

167.    Body odor is not merely a mundane hygiene matter; it is a deeply personal concern that carries profound psychological, social, and emotional significance. Concerns about body odor implicate fundamental aspects of self-esteem, social acceptance, intimate relationships, and mental health.

/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

168.   For over a century, the personal care industry, including Defendant's own parent company, Procter & Gamble, has deliberately cultivated and exploited social shame and anxiety around body odor to market deodorant and antiperspirant products. As documented in historical analyses of deodorant advertising, early 20th-century marketing campaigns systematically used scare copy tactics designed to make consumers anxious about their bodies and fearful that their body odor would betray them in ways they could not detect themselves.[58]

169.   An 1888 advertisement for Odorono deodorant, an early antiperspirant product, warned women that individuals troubled by perspiration odor rarely can detect it in themselves, creating what marketing scholars have characterized as psychological warfare designed to distance consumers from trust in their own bodies and perceptions. This advertising approach was explicitly intended to create anxiety about consumers' own bodies and cultivate the belief that their bodies could betray them in ways they would be unconscious of."[59]

170.   These historical marketing tactics established body odor as a source of social humiliation rather than merely a hygiene consideration. Advertisements explicitly linked body odor to romantic failure, social rejection, and professional inadequacy. A 1919 Mum deodorant advertisement warned that men discuss women critically behind their backs, talking about which women they refuse to dance with or take out, and that unpopularity often begins with the first hint of underarm odor.[60]

171.   This shame-based marketing approach was so effective that by the mid-20th century, deodorant use transformed from a niche product to a near-universal practice in American culture. Today, approximately 90% of Americans use deodorant,

---

[58] Science History Institute, *The Smell of Shame: How Deodorant Became Omnipresent in America*, Distillations Podcast (Mar. 15, 2017), available at
https://www.sciencehistory.org/stories/distillations-pod/the-smell-of-shame/.
[59] *Id.* (quoting Jean Retzinger, Media Studies Professor, University of California, Berkeley).
[60] Id.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  and the absence of deodorant use or concerns about body odor carry significant social

2  stigma.[61]

3      172.  Contemporary research confirms that concerns about body odor have

4  profound psychological impacts on affected individuals. Body odor anxiety triggers

5  feelings of embarrassment, self-consciousness, and social inadequacy. Individuals

6  worried about body odor experience heightened anxiety in social situations, reduced

7  confidence in professional and personal interactions, and fear of judgment or rejection

8  by others.[62]

9      173.  Research has documented that body odors from individuals with different

10  levels of self-esteem are perceivably different to others, with body odors from high self-

11  esteem individuals rated as more pleasant and less intense than those from low self-

12  esteem individuals.[63] This research confirms the deeply social nature of body odor

13  concerns and the extent to which body odor is linked to psychological well-being and

14  interpersonal dynamics.

15      174.  Body odor concerns create barriers leading to avoidance behaviors and

16  diminished self-confidence. These concerns affect how individuals interact with others,

17  causing some to withdraw from social situations or limit their professional and personal

18  engagement out of fear of judgment.[64]

19      175.  Even for individuals without clinical ORS, body odor concerns

20  significantly impact daily life and relationships. Body odor awareness creates anxiety

21  about physical proximity to others, reluctance to engage in professional networking or

22

_____

23  [61] Id.

24  [62] NOMOBO, *The Psychology of Smell: How Body Odor Affects Confidence and Relationships* (Nov. 2024), available at https://nomobo.com/blogs/body-care/the-psychology-of-smell-how-body-odor-affects-confidence-and-relationships.

25  [63] Smeets, M.A.M., Rosing, E.A.E., Jacobs, D.M., et al., *The role of fragrance and self-esteem in perception of body odors and impressions of others*, PLOS ONE (Nov. 2021), available at https://doi.org/10.1371/journal.pone.0258773

26

27  [64] Grand Rising Behavioral Health, *Olfactory Reference Syndrome: When Imagined Body Odor Causes Distress*, available at https://grandrisingbehavioral.com/blog/olfactory-reference-syndrome-when-imagined-body-odor-causes-distress/.

28

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  social activities, fear of intimacy in romantic relationships, and constant self-monitoring
2  and checking behaviors.[65]

3      176.    Research on the psychology of body odor confirms that body odor
4  awareness triggers anxiety and self-consciousness while lowering confidence, and
5  creates a source of embarrassment and stress that can lead to social withdrawal and
6  difficulty forming interpersonal bonds.[66]

7      177.    Body odor concerns have particular salience in professional and workplace
8  contexts, where perceived body odor can affect career advancement, workplace
9  relationships, and professional reputation. Employment counselors and human resources
10  professionals recognize body odor as one of the most difficult and humiliating workplace
11  issues to address, precisely because of the profound embarrassment and stigma involved.

12      178.    Employers who must address employee body odor concerns are counseled
13  to approach the matter with sensitivity because such discussions implicate deeply
14  personal matters of hygiene, health, culture, and self-perception. The difficulty and
15  delicacy required in workplace body odor discussions underscore the intensely private
16  nature of body odor concerns.[67]

17      179.    Academic analysis of workplace privacy recognizes that concerns about
18  body odor implicate fundamental dignity interests. As Professor Catherine Fisk of Duke
19  University Law School has written, workplace regulations that police employees' bodies
20  and personal hygiene constitute invasions of privacy because they intrude upon the
21  fundamental aspects of how individuals see and feel about themselves and how they
22  construct themselves for the rest of the world to see.[68]

23      180.    In many cases, concerns about body odor are directly linked to underlying
24  medical conditions. Excessive perspiration (hyperhidrosis), certain metabolic disorders,

25  _____
26  [65] Id.
    [66] NOMOBO, *supra* note 6.
27  [67] Id.
    [68] Catherine L. Fisk, *Privacy, Power, and Humiliation at Work: Re-Examining Appearance
28  Regulation as an Invasion of Privacy*, 66 La. L. Rev. 1109, 1112 (2006)

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  hormonal changes, medication side effects, and various other health conditions can cause

2  or exacerbate body odor. The Americans with Disabilities Act recognizes that certain

3  odor-related conditions may constitute disabilities requiring reasonable

4  accommodation.[69]

5  181.  Employers are specifically warned that if an employee discloses that body

6  odor is caused by a medical condition, employers should not make hasty judgments and

7  are instructed to treat such disclosures as protected health information. The medical

8  nature of many body odor concerns further underscores the sensitive and private nature

9  of information revealing that an individual is seeking solutions for body odor.

10  182.  Given the profound psychological, social, professional, and medical

11  implications of body odor concerns, the fact that Plaintiff was reading articles about body

12  odor management on Defendant's Website constitutes highly sensitive personal

13  information that Plaintiff reasonably expected would remain private.

14  183.  Plaintiff's decision to read articles titled "Finally, a Gentler and Kinder

15  Deodorant" and "This Deodorant is Kinder and Gentler on Your Skin"—both explicitly

16  discussing "odor protection," "fighting odor," and solutions for "sensitive" underarm

17  skin—reveals that Plaintiff was concerned about her own body odor and was seeking

18  products to address those concerns.

19  184.  This information is far more sensitive than generic product browsing.

20  Plaintiff was not simply shopping for soap or lotion; she was seeking solutions for a

21  personal concern that carries significant shame, stigma, and psychological weight in

22  American culture. The disclosure of Plaintiff's body odor concerns to third-party

23  advertising and data broker companies without her knowledge or consent constitutes a

24  profound invasion of privacy.

25  185.  Plaintiff had a reasonable expectation that her interest in body odor

26  solutions would not be disclosed to advertising networks, data brokers, and behavioral

27

28  [69] Employers Council, *supra* note 12.

1   profiling companies. The sensitivity of body odor concerns is precisely why individuals

2   seek information about such matters in what they believe to be private browsing sessions,

3   rather than discussing such concerns openly in social settings.

4        186.   Defendant's transmission of Plaintiff's body odor-related page URLs to

5   Google, Meta/Facebook, Tapad, and/or other third parties enabled those companies to

6   add "body odor concerns" to Plaintiff's behavioral profile, use that information for

7   targeted advertising, and potentially share that information with countless other data

8   brokers and advertising partners through cookie syncing and real-time bidding

9   processes.

10       187.   The sensitivity of body odor information is further heightened by the reality

11  that such information, once in the hands of data brokers and advertising networks, can

12  be combined with other personal information to create detailed profiles that could be

13  used for discriminatory purposes, employment screening, insurance underwriting, or

14  other uses that Plaintiff never anticipated or authorized.

15  ***10.   Defendant's Privacy Policy Misrepresentations and Unjust Enrichment***

16  ***Through Exploitation of Body Odor Sensitivity***

17       188.   Defendant's ability to monetize Plaintiff's body odor concerns through

18  unconsented tracking depends fundamentally on users' reasonable belief that their

19  browsing activity would remain private. This belief was cultivated and reinforced by

20  Defendant's Privacy Policy, which made specific representations designed to assure

21  users that their personal information would be protected and subject to meaningful user

22  control.

23       189.   At all relevant times, Defendant maintained a Privacy Policy accessible

24  through the Ivory.com website. This Privacy Policy made express representations about

25  how Defendant collects, uses, and discloses consumer information, including in a

26  "Frequently Asked Questions" section prominently displayed at the top of the policy.

27       190.   In response to the question "Do we give you control of your personal

28  data?", Defendant's Privacy Policy unequivocally states: "Yes." The policy further

represents: "You are in control of your personal data. You can exercise your rights and change your preferences anytime."

191.    In response to the question "Do we disclose your personal data to third-party partners?", Defendant's Privacy Policy states: "Yes, where we have a lawful basis to do so." This representation implies that third-party data sharing is conditional and occurs only pursuant to legal authorization.

192.    Defendant's Privacy Policy describes interest-based advertising as subject to user choice and opt-out mechanisms, including industry opt-outs through the Digital Advertising Alliance ("DAA") and the Network Advertising Initiative ("NAI"), as well as platform-level controls and cookie management tools. The policy states that users can "exercise choice with respect to interest-based advertising" and can "control cookies" through browser settings and consent management platforms.

193.    Defendant's Privacy Policy represents that its cookie consent management platform "allows you to exercise choice with respect to certain categories of cookies" and states that this tool "may appear as a cookie banner."

194.    In stark contrast to these privacy representations, analysis of Defendant's Website reveals that third-party tracking technologies automatically execute and transmit user data immediately upon page load before any consent interaction can occur and before any opt-out mechanism becomes accessible.

195.    Specifically, when users visit Defendant's Website, the following third-party tracking requests fire automatically upon initial page load:

a. Meta/Facebook: Requests to www.facebook.com/tr (Meta pixel) and connect.facebook.net (Meta JavaScript) transmit users' IP addresses, full page URLs (including body odor article URLs), browser and device identifiers, and persistent tracking identifiers.

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

b. Google: Requests to www.googletagmanager.com and www.google-analytics.com transmit users' IP addresses, full page URLs, referrer information, and device characteristics.

c. Tapad: Requests to pixel.tapad.com transmit users' IP addresses, device identifiers, and cross-device linking data to this registered California data broker's identity resolution infrastructure.

196.    These third-party transmissions occur before any opt-in, opt-out, or preference selection can be made. The tracking requests fire regardless of cookie banner interaction, and Defendant's cookie consent infrastructure functions as notice only, not as a mechanism that suppresses tracking pending user choice.

197.    Defendant's representation that users are "in control" of their personal data is materially misleading when tracking begins before any control is possible. Users cannot prevent Meta's pixel from firing, cannot stop Google Analytics from executing, cannot block identity resolution requests, and cannot halt attribution tracking because all of these transmissions occur automatically and instantaneously upon page load, before any user has an opportunity to exercise the "control" that Defendant's Privacy Policy promises.

198.    The opt-out mechanisms described in Defendant's Privacy Policy including DAA/NAI industry opt-outs, platform-level controls, and cookie management tools cannot cure data disclosures that have already been completed. By the time any user could navigate to any opt-out mechanism, the user's page views have already been transmitted to third parties.

199.    Defendant's representation that it discloses personal data to third parties only "where we have a lawful basis to do so" is materially misleading because the Privacy Policy never discloses that these disclosures occur before consent can be exercised, that identity-resolution vendors like Tapad are used, or that full page URLs including URLs revealing sensitive body odor concerns are transmitted immediately upon page load.

200.   A reasonable consumer reading Defendant's Privacy Policy would believe that tracking is conditional, that advertising disclosures occur after consent or choice, that identity resolution is optional or subject to user control, and that cookie tools meaningfully prevent tracking. The forensic evidence proves the opposite.

201.   Defendant did not engage in this deceptive surveillance by accident. Defendant embedded third-party trackers on its Website including on its body odor-related article pages because doing so generates substantial commercial value for Defendant.

202.   As alleged above, Defendant monetizes its Website through the real-time bidding ecosystem. When users visit Defendant's Website, information about those users (including their IP addresses, device identifiers, and the specific pages they view) is transmitted to advertising exchanges where advertisers bid in real-time for the opportunity to show advertisements to those users.

203.   The more information Defendant can provide about its users, the more valuable those advertising impressions become, and the more revenue Defendant generates. A generic "Ivory.com visitor" is worth less to advertisers than a specifically identified user known to have concerns about body odor, sensitive skin, or particular product preferences.

204.   By enabling Google, Meta/Facebook, Tapad, and other third parties to collect detailed information about users' body odor concerns, Defendant enriches the data profiles that those companies maintain, which in turn increases the value of users as advertising targets. This increased value accrues to Defendant through higher advertising revenue and more effective marketing of its products.

205.   Defendant also benefits from the tracking infrastructure by gaining detailed analytics about which articles users read, how users navigate through body odor-related content, and which messaging is most effective at converting users concerned about body odor into purchasers of Ivory deodorant products. This business intelligence is

1  valuable to Defendant and informs its product development, marketing strategy, and e-
2  commerce optimization.

3  206.  Critically, Defendant could not have obtained this value through legitimate
4  means. If Defendant had honestly disclosed prior to users' visits that reading articles
5  about body odor would result in that information being immediately shared with Google,
6  Meta/Facebook, Tapad, and other third parties before any consent mechanism could be
7  accessed, users would have either:

8       a. Declined to visit the Website, depriving Defendant of any data or
9  opportunity to market products; or

10      b. Demanded compensation in exchange for allowing such sensitive
11  information to be disclosed.

12  207.  By using its Privacy Policy to create a false sense of security and control,
13  Defendant was able to extract sensitive body odor information from users without having
14  to pay for it and without experiencing the loss of traffic that would result from honest
15  disclosure.

16  208.  This extraction of value through misrepresentation constitutes unjust
17  enrichment. Defendant received a benefit (valuable body odor-related behavioral data
18  and the enhanced advertising revenue that flows from it) at users' expense (the privacy
19  loss and stigma associated with disclosure of body odor concerns), under circumstances
20  that make it unjust for Defendant to retain that benefit (because it was obtained through
21  misrepresentation about privacy protections and user control).

22  209.  The unjust enrichment here is particularly egregious because of the specific
23  sensitivity of the information Defendant extracted. This is not a case of tracking generic
24  product browsing—Defendant specifically profited from the disclosure of users' body
25  odor concerns, a category of information that carries unique psychological and social
26  weight as detailed above.

27  210.  Defendant is intimately familiar with the stigma and shame associated with
28  body odor. As the owner of the Ivory brand and operator of the Ivory.com website,

Defendant is directly engaged in marketing deodorant and antiperspirant products, a category that has historically been marketed through shame-based messaging designed to exploit consumers' anxieties about social rejection due to body odor.

211.    Defendant's own articles on body odor (the very articles that Plaintiff read) acknowledge the sensitive nature of body odor concerns by emphasizing "gentle" care, "kind" treatment of "sensitive" skin, and freedom from "irritants." In the shared articles, the Website makes direct references "odor," "odor protection," and "strong deodorants." The Website acknowledges that body odor concerns "extend … to those around you", that being responsible for the effect your body odor may have is a "kindness" of concern, and that using proper deodorant you are " better equipped to spread kindness all around." The Defendant's subtle shaming and gentle, reassuring tone of Defendant's deodorants as a solution to body odor reflects Defendant's understanding that consumers approach this topic with anxiety and desire for discretion.

212.    Given Defendant's sophisticated understanding of body odor psychology and the commercial value of body odor-related consumer data, Defendant's decision to deploy hidden tracking technologies on its body odor article pages, while simultaneously representing in its Privacy Policy that users are "in control" of their personal data, constitutes a calculated decision to profit from consumers' vulnerability and trust.

213.    Defendant has been unjustly enriched by extracting sensitive body odor information from Plaintiff and Class Members through fraud, coercion and/or misrepresentation, and equity requires that Defendant disgorge the ill-gotten gains obtained through this deceptive surveillance.

**11.    *Concrete Injury, Privacy Harm, and Commercial Exploitation of Plaintiff's Data***

214.    During Plaintiff's session, the Website transmitted Plaintiff's public IP address, user-agent string, device fingerprint attributes, full product-page URLs, timing signals, and persistent identifiers (including Google cid, Meta _fbp and _fbc, BazaarVoice bv_uuid, and Tapad Tapad_DID) to Google, Meta, BazaarVoice, and Tapad in real time. Each of these entities maintains commercial identity-resolution

systems that append such identifiers to existing advertising identity graphs. As a result, Plaintiff's household and device were incorporated into downstream advertising databases used for behavioral targeting, audience segmentation, and commercial profiling.

215.    The collection and identity-resolution of Plaintiff's information was not passive or incidental; it occurred within commercial systems designed to monetize household-level behavioral data. Plaintiff's household identity-graph entry was used to facilitate advertising reach, frequency capping, behavioral segmentation, and cross-platform retargeting.

216.    Before Defendant's product pages fully rendered in Plaintiff's browser, the Website caused Plaintiff's device to transmit GET and POST requests to Google, Meta, BazaarVoice, and Tapad, including the full product-page URLs she was attempting to load, together with her IP address and device-fingerprinting data. These transmissions occurred automatically, without Plaintiff's knowledge, and before she could view, interact with, or meaningfully consent to any tracking. This constitutes the secret duplication and transmission of Plaintiff's electronic communications.

217.    Upon receipt of Plaintiff's identifiers during her session, Google, Meta, BazaarVoice, and Tapad necessarily performed automated ID-graph operations, which include: mapping the identifier to a device or household, updating existing graph nodes, and propagating the appended identifier into downstream advertising datasets. These processes occur by design and require no discretionary action by the Plaintiff.

218.    Because Plaintiff's session transmitted persistent identifiers already recognized by Google, Meta, and Tapad's commercial identity-graph systems, those companies necessarily updated or reaffirmed existing profiles tied to Plaintiff's device and household. Identity-graph participation is automatic and algorithmic upon receipt of these identifiers; no additional action by Plaintiff is required.

219.    Because Plaintiff's personal routing and addressing information was transmitted to and ingested by multiple third-party advertising systems, her injury is not

merely a statutory violation but the precise kind of dissemination-based privacy harm that confers Article III standing.

220. By transmitting Plaintiff's public IP address and device-fingerprinting attributes to the Third Parties, Defendant caused Plaintiff's household to be matched, resolved, and incorporated into existing commercial identity-graph products.

221. The Third Parties—including advertising-exchange, identity-resolution, and behavioral-targeting vendors—use incoming IP address and device-identifying signals to match individuals and households to persistent identity-graph entries used for targeted advertising, cross-context behavioral profiling, and measurement. Plaintiff's household was accordingly placed into these commercial identity graphs, which are bought, sold, licensed, and shared across the digital advertising ecosystem.

222. Plaintiff's information was incorporated into third-party behavioral-profiling, cross-site tracking, and commercial identity-resolution systems, which constitute concrete privacy injuries historically recognized as analogous to breach of confidence, invasion of privacy, and intrusion upon seclusion. Plaintiff suffered concrete harm because her communications were secretly intercepted by unknown third-party entities while in transit, a privacy intrusion historically treated as a concrete injury analogous to common-law eavesdropping.

## V. <u>SPECIFIC ALLEGATIONS</u>

### 1.   *The Google Trackers*

223. The Google Trackers (including Google Tag Manager, Google Analytics, and Google Ads/DoubleClick) are embedded on the Website and automatically execute on page load. When they run, they transmit users' IP addresses, full page URLs, referrer headers, timestamps, user-agent/device characteristics, and persistent identifiers to Google's servers, functioning as pen registers and/or trap-and-trace devices by capturing addressing and signaling information associated with users' communications with the Website.

224. **Figure 9** is a Chrome DevTools capture showing a GET request to

https://www.googletagmanager.com/gtm.js?id=GTM-…, initiated on page load without user interaction. The record reflects the destination host, the request method, a 200 OK response, and the remote Google IP (IPv6 block 2607:f8b0:…:2008:443). Headers include Referer: https://ivory.com, cache directives, and cross-origin allowances, confirming that Ivory invoked Google Tag Manager to load and coordinate subsequent Google scripts and tags for further collection and dispatch of user signaling data.

**Figure 9:**



225.   **Figure 10** is a Fiddler capture of a request to Google Analytics that was intercepted in real time via live outbound stream, showing the browser transmitting to https://www.google-analytics.com/collect (or equivalent measurement endpoint). The query string carries granular analytics metadata, including page path and category parameters, campaign/session fields, timing data, and client identifiers; the headers show the full User-Agent string (browser/OS build), Referer (the Ivory page), and cache transport details. This evidences that Ivory's implementation caused Plaintiff's and Class Members' addressing, routing, and device metadata to be sent directly to Google during the session.

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 10:**



226. **Figure 11** below confirms that the URLs of the body odor-related pages Plaintiff visited were transmitted to Google in human-readable form. Figure 11 captured the Google Analytics payload transmitted during Plaintiff's navigation, which includes: (a) the exact page URL parameter (dl) displaying the full human-readable address of the body odor article viewed; (b) the document title parameter (dt) reflecting the specific product name and body odor-related content; (c) the referrer URL parameter (dr) showing Plaintiff's navigation path through Defendant's body odor and deodorant content; and (d) a unique client identifier (cid) associated with Plaintiff's browser session. All values were transmitted in human-readable form within the request parameters.

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 11:**



227.   Defendant surreptitiously installed, executed, embedded, or injected the Google Trackers onto users' browsers by copying the Google JavaScript snippets and adding them to the Website. When a user visits the Website, the browser executes those scripts, which trigger network requests that send data about the user's interactions, including the user's IP address, to Google's servers as part of third-party tracking and advertising infrastructure.

228.   The Google Trackers are at least a "process" because they are software that identifies consumers, gathers data, and correlates that data.

229.   The Google Trackers are at least a "device" because, for software to work, it must be run on computing hardware. See, e.g., James v. Walt Disney Co., 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

230.   The Google Trackers capture non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details.

63

231.    Through this process, Google systematically engages in persistent user tracking, behavioral profiling, and audience segmentation, all without the user's awareness, consent, or meaningful ability to control the collection and dissemination of their personal browsing information.

232.    Moreover, by embedding the Google Trackers onto the Website, Defendant enabled Google to track users' activity beyond the Website itself. The Google Trackers assign and read persistent identifiers (e.g., GA client IDs and related identifiers) that allow Google to monitor user behavior across multiple unrelated websites that deploy Google's tracking technology. As a result, Google can compile detailed, longitudinal behavioral profiles based not only on interactions with the Website, but also on broader browsing activities across the internet. This cross-site tracking occurs without the user's awareness or consent, further exacerbating the privacy invasions resulting from Defendant's conduct.

233.    The Google Trackers initiate connections to Google's analytics and advertising servers (including but not limited to www.google-analytics.com/collect, www.googletagmanager.com/gtm.js, googleads.g.doubleclick.net, and adservice.google.com) upon page load. These connections transmit routing and signaling metadata, including users' IP addresses, user-agent strings, full URL paths, referrer headers, and timestamps. These data points enable Google to identify the source and destination of the communication, synchronize user identifiers across properties, and build cross-site behavioral profiles for targeting and audience segmentation. Accordingly, the Google Trackers function as a pen register and/or trap-and-trace device and/or process.

234.    Defendant never obtained a court order permitting the installation of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Google Trackers or to collect or share data with Google.

235.    Defendant's secret installation of the Google Trackers on the Website violates CIPA regarding unauthorized use of a pen register and/or trap-and-trace device

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  or process without prior consent or court order.

2  *2.    **The Facebook Tracker***

3       236.    Defendant's Website embeds the Facebook Pixel tracker, which loads from

4  connect.facebook.net and www.facebook.com. When a user visits the Website, the Pixel

5  automatically executes, transmitting Plaintiff's and Class Members' IP addresses, page

6  paths, referrer URLs, timestamps, device/browser characteristics, and unique identifiers

7  to Meta Platforms, Inc. servers. The Facebook Tracker thus functions as a pen register

8  and/or trap-and-trace device by capturing addressing and signaling information tied to

9  users' communications with the Website.

10      237.    **Figure 12** is a Chrome DevTools capture showing multiple GET requests

11  to connect.facebook.net/en_US/fbevents.js and related configuration endpoints. Each

12  request is marked with a 200 OK status and demonstrates that the Ivory.com homepage

13  triggered automatic execution of the Facebook Pixel script. The response headers and

14  payload show that the tracker loads JavaScript directly from Meta's servers, embedding

15  code that records subsequent user events and transmits them to Facebook's advertising

16  and profiling infrastructure.

17                          **Figure 12:**

18

19

20

21  

22

23

24

25

26

27

28

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

238. **Figure 13** is a Fiddler capture documenting a request to https://www.facebook.com/tr/…&ev=PageView… that was intercepted in real time via live outbound stream. This request string encodes granular metadata, including the event type (PageView), the full referrer (https://ivory.com), screen resolution (1536x784), language headers (en-GB,en-US;q=0.9), and the User-Agent string revealing browser and operating system details. The record shows that Plaintiff's browser transmitted routing and addressing information, persistent identifiers, and event metadata directly to Facebook's servers during the live session.

**Figure 13:**



239. **Figure 14** is a Wireshark capture showing DNS queries and responses for connect.facebook.net and www.facebook.com. The queries originate from the client IP (198.19.190.52) and resolve to Facebook-controlled infrastructure. The resolution path includes CNAME records such as scontent.xx.fbcdn.net and star-mini.c10r.facebook.com, confirming that the Ivory Website triggered DNS lookups directing user traffic to Meta's tracking servers. This evidences the capture and use of addressing information to route user communications to third-party endpoints outside the Website.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 14:**



240. **Figure 15** below confirms that the URLs of the body odor-related pages Plaintiff visited were transmitted to Meta in human-readable form.  Figure 15 of the captured the Meta/Facebook payload transmitted during Plaintiff's navigation, which includes: (a) the exact product page URL parameter (dl) displaying the full human-readable address of the body odor article viewed; (b) the referrer URL parameter (rl) showing navigation context through Defendant's deodorant content; (c) the Facebook persistent identifier (fbp) enabling Meta to associate the body odor page views with Plaintiff's device across sessions and websites; and (d) human-readable product information, including page title and descriptive content, transmitted in readable form within the request parameters.

/ / /

/ / /

/ / /

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 15:**



241.  Defendant surreptitiously installed, executed, embedded, or injected the Facebook Tracker onto users' browsers by copying Meta's JavaScript snippet and adding it to the Website. When a user visits the Website, the browser executes the script, triggering network requests that send data about the user's interactions, including the user's IP address, to Facebook's servers as part of third-party tracking and advertising infrastructure.

242.  The Facebook Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

243.  The Facebook Tracker is at least a "device" because, for software to work, it must be executed on computing hardware. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

244.  The Facebook Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, and referrer data associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details.

245.  Through this process, Facebook systematically engages in persistent user

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

tracking, behavioral profiling, and audience segmentation, all without the user's awareness, consent, or meaningful ability to control the collection and dissemination of their personal browsing information.

246.  Moreover, by embedding the Facebook Tracker onto the Website, Defendant enabled Facebook to track users' activity beyond the Website itself. The Pixel assigns and syncs persistent identifiers (e.g., _fbp cookies and event IDs) that allow Meta to monitor behavior across multiple unrelated websites that deploy the Pixel. As a result, Meta can compile detailed, longitudinal behavioral profiles based on users' interactions both with the Website and across the internet. This cross-site tracking occurs without the user's awareness or consent, further exacerbating the privacy invasions resulting from Defendant's conduct.

247.  The Facebook Tracker initiates connections to Meta's servers at connect.facebook.net and www.facebook.com/tr/ upon page load. These connections transmit routing and signaling metadata, including IP addresses, user-agent strings, URL paths, referrer headers, and timestamps. These data points enable Meta to identify both the source and destination of the communication, facilitate ID synchronization across domains, and support the construction of cross-site profiles for targeted advertising. Accordingly, the Facebook Tracker functions as a pen register and/or trap-and-trace device and/or process.

248.  Defendant never obtained a court order permitting the installation of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Facebook Tracker or to collect or share data with Meta.

249.  Defendant's secret installation of the Facebook Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap-and-trace device or process without prior consent or court order.

### 3.    *The Tapad Tracker*

250.  Defendant's Website embeds the Tapad Tracker, which loads from pixel.tapad.com and facilitates identity resolution across devices and platforms. When a

user visits the Website, the Tapad Tracker executes automatically, transmitting Plaintiff's and Class Members' IP addresses, referrer headers, timestamps, device/browser characteristics, and unique Tapad identifiers to Tapad's servers. The Tapad Tracker thereby functions as a pen register and/or trap-and-trace device by capturing addressing and signaling information tied to users' communications with the Website.

251.    **Figure 16** is a Wireshark capture showing DNS queries and responses for pixel.tapad.com. The client IP (198.19.190.52) issued a DNS request that resolved to Tapad's IP space (34.111.113.62). This demonstrates that Ivory's Website caused Plaintiff's browser to initiate address lookups routing user communications to Tapad infrastructure, capturing addressing and signaling information in the process.

## **Figure 16:**



252.    **Figure 17** is a Fiddler capture documenting a request to https://pixel.tapad.com/idsync/ex/receive/check?... that was intercepted in real time via live outbound stream. The request includes query string parameters such as partner_id and device_id, confirming Tapad's role in cross-domain identifier syncing. The headers expose the full User-Agent string (browser, OS build, rendering engine), the Referer

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

(https://ivory.com), language preferences, and active Tapad cookies (Tapad_TS, Tapad_DID). This record demonstrates that Plaintiff's and Class Members' browsers transmitted persistent identifiers, routing metadata, and behavioral context directly to Tapad's servers.

**Figure 17:**



253. **Figure 18** is a Chrome DevTools capture showing multiple GET requests to pixel.tapad.com/idsync/ex/receive/ endpoints. Each returned a 200 OK response from Tapad's IP (34.111.113.62), with headers such as Sec-CH-UA, Sec-CH-UA-Arch, and Sec-CH-UA-Mobile reflecting granular device characteristics. These values enable Tapad to conduct device fingerprinting, identity resolution, and synchronization of user identifiers across its advertising ecosystem. The evidence confirms that the Ivory Website delivered user signaling and routing metadata to Tapad servers without user consent.

///

///

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

**Figure 18:**



254.   Defendant surreptitiously installed, executed, embedded, or injected the Tapad Tracker onto users' browsers by copying Tapad's JavaScript snippet and adding it to the Website. When a user visits the Website, the browser executes the script, triggering network requests that send data about the user's interactions, including the user's IP address, to Tapad's servers as part of third-party tracking and identity resolution infrastructure.

255.   The Tapad Tracker is at least a "process" because it is software that identifies consumers, gathers data, and correlates that data.

256.   The Tapad Tracker is at least a "device" because, for software to work, it must be executed on computing hardware. See, e.g., *James v. Walt Disney Co.*, 2023 WL 7392285, at *13 (N.D. Cal. Nov. 8, 2023).

257.   The Tapad Tracker captures non-content signaling information such as IP addresses, URLs visited, timestamps, browser and device identifiers, referrer data, and persistent cookies associated with electronic communications between the user and the Website. This metadata reflects addressing and routing details.

258.   Through this process, Tapad systematically engages in persistent user tracking, behavioral profiling, and identity resolution, all without the user's awareness,

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

consent, or meaningful ability to control the collection and dissemination of their personal browsing information.

259.    Moreover, by embedding the Tapad Tracker onto the Website, Defendant enabled Tapad to monitor user activity across multiple unrelated websites. Tapad's identifier syncing and identity resolution capabilities allow it to link user behavior across devices and domains, producing comprehensive cross-site profiles that extend well beyond the Ivory Website. This cross-site tracking occurs without the user's awareness or consent, further exacerbating the privacy invasions resulting from Defendant's conduct.

260.    The Tapad Tracker initiates connections to Tapad's servers (pixel.tapad.com) upon page load. These connections transmit routing and signaling metadata, including IP addresses, user-agent strings, full URL paths, referrer headers, timestamps, and persistent identifiers. These data points enable Tapad to identify both the source and destination of the communication, synchronize identifiers with partners, and build longitudinal behavioral profiles for advertising and data broker monetization. Accordingly, the Tapad Tracker functions as a pen register and/or trap-and-trace device and/or process.

261.    Defendant never obtained a court order permitting the installation of a pen register or trap-and-trace device or process and did not obtain Plaintiff's or the Class Members' consent to install the Tapad Tracker or to collect or share data with Tapad.

262.    Defendant's secret installation of the Tapad Tracker on the Website violates CIPA regarding unauthorized use of a pen register and/or trap-and-trace device or process without prior consent or court order.

## VI.    CLASS ALLEGATIONS

263.    Plaintiff brings this action individually and on behalf of all others similarly situated (the "Class" or "Class Members") defined as follows:

/ / /

All persons within California whose browser was subject to installation, execution, embedding, or injection of the Trackers by the Defendant's Website during the relevant statute of limitations period.

264. **NUMEROSITY:** Plaintiff does not know the number of Class Members but believes the number to be in the thousands, if not more. The exact identities of Class Members can be ascertained by the records maintained by Defendant.

265. **COMMONALITY:** Common questions of fact and law exist as to all Class Members and predominate over any questions affecting only individual members of the Class. Such common legal and factual questions, which do not vary between Class members, and which may be determined without reference to the individual circumstances of any Class Member, include but are not limited to the following:

- Whether Defendant installed, executed, embedded, or injected the Trackers on the Website;
- Whether the Trackers are each a pen register and/or trap and trace device as defined by law;
- Whether Defendant caused Plaintiff's and Class Members' communications with the Website to be duplicated and transmitted to third parties in real time;
- Whether Plaintiff and Class Members are subject to same tracking policies and practices;
- Whether Defendant violated CIPA;
- Whether Plaintiff and Class Members are entitled to statutory damages;
- Whether Class Members are entitled to injunctive relief; and
- Whether Class Members are entitled to disgorgement of data unlawfully obtained.

266. **TYPICALITY:** As a person who visited Defendant's Website and whose outgoing electronic information was surreptitiously collected by the Trackers, Plaintiff is asserting claims that are typical of the Class Members. Plaintiff's experience with the Trackers is typical to Class Members.

267.  **ADEQUACY:**  Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained attorneys experienced in class action litigation. All individuals with interests that are actually or potentially adverse to or in conflict with the Class or whose inclusion would otherwise be improper are excluded.

268.  **SUPERIORITY:** A class action is superior to other available methods of adjudication because individual litigation of the claims of all Class Members is impracticable and inefficient. Even if every Class Member could afford individual litigation, the court system could not. It would be unduly burdensome to the courts in which individual litigation of numerous cases would proceed. Individualized litigation also presents a potential for inconsistent or contradictory judgments.

## VII.    FIRST CAUSE OF ACTION
### Violations of Cal. Penal Code § 638.51
### *By Plaintiff and the Class Members Against All Defendants*

269.  Plaintiff reasserts and incorporates by reference the allegations set forth in each preceding paragraph as though fully set forth herein.

270.  Plaintiff brings this claim individually and on behalf of the members of the proposed Class against Defendant.

271.  Defendant uses a pen register device or process and/or a trap and trace device or process on its Website by deploying the Trackers because the Trackers are designed to capture the IP address, User Information, and other information such as the phone number, email, routing, addressing and/or other signaling information of website visitors.

272.  The Trackers recorded Plaintiff and Class Members' dialing, routing, addressing, and signaling information in real time, automatically transmitting this dialing, routing, addressing and signaling data to multiple third-party ad-tech endpoints before the Webpage fully loaded.

273.  Defendant did not obtain consent from Plaintiff or any of the Class Members before using pen registers or trap and trace devices to locate or identify users

1   of its Website and has thus violated CIPA. CIPA imposes civil liability and statutory

2   penalties for violations of § 638.51. Cal. Penal Code § 637.2; *Moody v. C2 Educational*

3   *Systems, Inc.*, No. 2:24-cv-04249-RGK-SK, 2024 U.S. Dist. LEXIS 132614 (C.D. Cal.

4   July 25, 2024).

## VIII.   SECOND CAUSE OF ACTION

### Violations of Cal. Penal Code § 631

### *By Plaintiff and the Class Members Against All Defendants*

8   274.   Plaintiff reasserts and incorporates by reference the allegations set forth in

9   each preceding paragraph as though fully set forth herein.

10   275.   California Penal Code § 631(a) prohibits (1) willfully tapping, or making

11   an unauthorized connection with, a wire, line, or cable; (2) willfully reading, attempting

12   to read, or learning the contents or meaning of any communication while it is in transit;

13   and (3) using or attempting to use, or communicating information so obtained. The

14   statute further prohibits aiding or assisting a third party in committing such interception.

15   276.   When Plaintiff and Class Members accessed the Website using their

16   personal devices, their browser initiated a series of HTTPS GET and POST requests

17   containing their routing and addressing information, including the full URLs they

18   visited, referrer data, timestamps, public IP address associated with her household, user-

19   agent string, device configuration attributes, and other network-level metadata required

20   for page delivery. These communications were transmitted from Plaintiff and Class

21   Members' devices to Defendant's servers for the purpose of retrieving webpage content.

22   277.   Embedded within the Website were multiple third-party tracking scripts—

23   including Google Analytics, Google Ads/DoubleClick, and Google Tag Manager—that

24   executed automatically upon page load. These scripts caused Plaintiff and Class

25   Members' browser to duplicate and transmit her communications to third-party domains

26   (including   google-analytics.com,   doubleclick.net,   and   gtm.js**)**   in   real   time,

27   contemporaneously with her request to Defendant. These transmissions occurred within

28

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

1  milliseconds of the initial page request and before Defendant delivered the requested

2  content to Plaintiff's device.

3      278.   Plaintiff and Class Members' devices sent the third-party interceptors the

4  full URLs of the pages she visited, referrer paths, IP-address-linked identifiers, and

5  device-fingerprinting  characteristics.  These  communications  were  transmitted

6  automatically, without any action by Plaintiff and Class Members other than loading the

7  webpage, and without any disclosure informing them that third parties would receive her

8  communications. Plaintiff and Class Members did not consent to these hidden third-party

9  interceptions.

10     279.   The third-party tracking entities receiving Plaintiff and Class Members'

11  communications are independent of Defendant and use the information they collect for

12  their  own  commercial  purposes,  including  cross-site  tracking,  behavioral  analysis,

13  audience measurement, and ad-tech profiling. Defendant's intentional deployment of

14  these third-party scripts constitutes aiding and assisting the unlawful interception of

15  Plaintiff's communications under § 631(a).

16     280.   These  Third  Parties,  not  Defendant,  were  the  entities  that  actually

17  intercepted Plaintiff's communications by receiving duplications of her HTTP requests,

18  URLs, referrer headers, and other routing and addressing signals contemporaneously

19  with transmission, making them non-party eavesdroppers under Penal Code § 631(a).

20     281.   Plaintiff and Class Members reasonably expected that her communications

21  with the Website—including the URLs she visited, device metadata, and timing and

22  routing signals generated by her browser—would be exchanged solely between herself

23  and Defendant. Plaintiff and Class Members did not expect or authorize Defendant to

24  cause  these  communications  to  be  contemporaneously  transmitted  to  multiple

25  independent data-analytics and advertising companies.  Plaintiff and Class Members did

26  not know, and reasonably did not expect, that independent third-party advertising,

27  analytics,  or  behavioral-profiling  companies  would  receive,  record,  or  analyze  her

28  communications with the Website.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

282. Defendant knowingly used the information obtained through these interceptions to analyze and track user behavior and to optimize advertising-related functions on its website. Through these acts, Defendant violated each prong of § 631(a), and Plaintiff suffered privacy invasions recognized as actionable under California law.

283. Plaintiff and Class Members suffered a concrete privacy injury when Defendant caused her communications with the Website to be secretly duplicated and transmitted to unrelated third-party entities during transmission, without her knowledge or consent. The secrecy of one's private communications, and the right to control who receives them, is a traditionally recognized privacy interest at common law, including intrusion upon seclusion, breach of confidence, and eavesdropping. Defendant's undisclosed redirection of Plaintiff and Class Members' routing, addressing, and signaling information to commercial surveillance companies invaded this protected privacy interest and caused an Article III injury.

284. Plaintiff seeks all available statutory remedies, including injunctive relief, liquidated damages, and attorneys' fees.

## IX.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for the following:

1. An order certifying the Class, naming Plaintiff as Class representative, and naming Plaintiff's attorneys as Class counsel;

2. An order declaring that Defendant's conduct violates CIPA;

3. An order of judgment in favor of Plaintiff and the Class against Defendant on the cause of action asserted herein;

4. An order enjoining Defendant's conduct as alleged herein;

5. Statutory damages pursuant to CIPA;

6. Prejudgment interest;

7. Reasonable attorney's fees and costs; and

8. All other relief that would be just and proper as a matter of law or equity.

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury on all causes of action and issues so triable.

Respectfully submitted,

Dated:   January 5, 2026        **NATHAN & ASSOCIATES, APC**


By:  _/s/ Reuben D. Nathan_____
Reuben D. Nathan
2901 W. Coast Hwy., Suite 200
Newport Beach, CA 92663
Office: (949) 270-2798
Email: rnathan@nathanlawpractice.com


**LAW OFFICES OF ROSS CORNELL, APC**
Ross Cornell, Esq. (SBN 210413)
P.O. Box 1989 #305
Big Bear Lake, CA 92315
Office: (562) 612-1708
Email: rc@rosscornelllaw.com


*Attorneys for Plaintiff and the Putative Class*

FIRST AMENDED CLASS ACTION COMPLAINT – JURY TRIAL DEMANDED